# DELAWARE STATE COLLEGE ET AL. *v.* RICKS

No. 79-939. Argued October 7, 1980—Decided December 15, 1980

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 262. STEVENS, J., filed a dissenting opinion, *post,* p. 265.

*Nicholas H. Rodriguez* argued the cause for petitioners. With him on the briefs were *Harold Schmittinger* and *William D. Fletcher, Jr.*

*Judith E. Harris* argued the cause and filed briefs for respondent.*

*Robert E. Williams, Douglas S. McDowell,* and *Daniel R. Levinson*

Justice Powell delivered the opinion of the Court.

The question in this case is whether respondent, a college professor, timely complained under the civil rights laws that he had been denied academic tenure because of his national origin.

I

Columbus Ricks is a black Liberian. In 1970, Ricks joined the faculty at Delaware State College, a state institution attended predominantly by blacks. In February 1973, the Faculty Committee on Promotions and Tenure (the tenure committee) recommended that Ricks not receive a tenured position in the education department. The tenure committee, however, agreed to reconsider its decision the following year. Upon reconsideration, in February 1974, the committee adhered to its earlier recommendation. The following month, the Faculty Senate voted to support the tenure committee's negative recommendation. On March 13, 1974, the College Board of Trustees formally voted to deny tenure to Ricks.

Dissatisfied with the decision, Ricks immediately filed a grievance with the Board's Educational Policy Committee (the grievance committee), which in May 1974 held a hearing and took the matter under submission.[1] During the pendency of the grievance, the College administration continued to plan for Ricks' eventual termination. Like many colleges

filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Deputy Solicitor General Wallace, Edwin S. Kneedler, Leroy D. Clark, Joseph T. Eddins,* and *Lutz Alexander Prager* for the United States et al.; and by *David M. Rabban* and *Victor J. Stone* for the American Association of University Professors.

[1] According to the Court of Appeals, the grievance committee almost immediately recommended to the Board that Ricks' grievance be denied. 605 F. 2d 710, 711 (CA3 1979). Nothing in the record, however, reveals the date on which the grievance committee rendered its decision.

and universities, Delaware State has a policy of not discharging immediately a junior faculty member who does not receive tenure. Rather, such a person is offered a "terminal" contract to teach one additional year. When that contract expires, the employment relationship ends. Adhering to this policy, the Trustees on June 26, 1974, told Ricks that he would be offered a 1-year "terminal" contract that would expire June 30, 1975.[2] Ricks signed the contract without ob-

---

[2] The June 26 letter stated:

June 26, 1974

Dr. Columbus Ricks
Delaware State College
Dover, Delaware

Dear Dr. Ricks:

On March 13, 1974, the Board of Trustees of Delaware State College officially endorsed the recommendations of the Faculty Senate at its March 11, 1974 meeting, at which time the Faculty Senate recommended that the Board not grant you tenure.

As we are both aware, the Educational Policy Committee of the Board of Trustees has heard your grievance and it is now in the process of coming to a decision. The Chairman of the Educational Policy Committee has indicated to me that a decision may not be forthcoming until sometime in July. In order to comply with the 1971 Trustee Policy Manual and AAUP requirements with regard to the amount of time needed in proper notification of non-reappointment for non-tenured faculty members, the Board has no choice but to follow actions according to its official position prior to the grievance process, and thus, notify you of its intent not to renew your contract at the end of the 1974–75 school year.

Please understand that we have no way of knowing what the outcome of the grievance process may be, and that this action is being taken at this time in order to be consistent with the present formal position of the Board and AAUP time requirements in matters of this kind. Should the Educational Policy Committee decide to recommend that you be granted tenure, and should the Board of Trustees concur with their recommendation, then of course, it will supersede any previous action taken by the Board.

Sincerely yours,

/s/ Walton H. Simpson, President
Board of Trustees of Delaware State College

jection or reservation on September 4, 1974. Shortly thereafter, on September 12, 1974, the Board of Trustees notified Ricks that it had denied his grievance.

Ricks attempted to file an employment discrimination charge with the Equal Employment Opportunity Commission (EEOC) on April 4, 1975. Under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, however, state fair employment practices agencies have primary jurisdiction over employment discrimination complaints. See 42 U. S. C. § 2000e–5 (c). The EEOC therefore referred Ricks' charge to the appropriate Delaware agency. On April 28, 1975, the state agency waived its jurisdiction, and the EEOC accepted Ricks' complaint for filing. More than two years later, the EEOC issued a "right to sue" letter.

Ricks filed this lawsuit in the District Court on September 9, 1977.[3] The complaint alleged, *inter alia,* that the College had discriminated against him on the basis of his national origin in violation of Title VII and 42 U. S. C. § 1981.[4] The District Court sustained the College's motion to dismiss both claims as untimely. It concluded that the only unlawful em-

---

[3] In addition to the College itself, other defendants (petitioners in this Court) are Trustees Walton H. Simpson, William H. Davis, William G. Dix, Edward W. Hagemeyer, James C. Hardcastle, Delma Lafferty, James H. Williams, William S. Young, Burt C. Pratt, Luna I. Mishoe, and Pierre S. duPont IV (ex officio); the academic dean, M. Milford Caldwell (now deceased); the education department chairman, George W. McLaughlin; and tenure committee members Romeo C. Henderson, Harriet R. Williams, Arthur E. Bragg, Ora Bunch, Ehsan Helmy, Vera Powell, John R. Price, Herbert Thompson, W. Richard Wynder, Ulysses Washington, and Jane Laskaris.

[4] Section 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

ployment practice alleged was the College's decision to deny Ricks tenure, and that the limitations periods for both claims had commenced to run by June 26, 1974, when the President of the Board of Trustees officially notified Ricks that he would be offered a 1-year "terminal" contract. See n. 2, *supra*. The Title VII claim was not timely because Ricks had not filed his charge with the EEOC within 180 days after that date. Similarly, the § 1981 claim was not timely because the lawsuit had not been filed in the District Court within the applicable 3-year statute of limitations.[5]

The Court of Appeals for the Third Circuit reversed. 605 F. 2d 710 (1979). It agreed with the District Court that Ricks' essential allegation was that he had been denied tenure illegally. *Id.*, at 711. According to the Court of Appeals, however, the Title VII filing requirement, and the statute of limitations for the § 1981 claim, did not commence to run until Ricks' "terminal" contract expired on June 30, 1975. The court reasoned:

> " '[A] terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer as long as he is still working, even though he has been told of the employer's present intention to terminate him in the future.' " *Id.*, at 712, quoting *Bonham* v. *Dresser Industries, Inc.*, 569 F. 2d 187, 192 (CA3 1977), cert. denied, 439 U. S. 821 (1978).

See *Egelston* v. *State University College at Geneseo*, 535 F. 2d 752 (CA2 1976); cf. *Noble* v. *University of Rochester*, 535 F. 2d 756 (CA2 1976).

The Court of Appeals believed that the initial decision to terminate an employee sometimes might be reversed. The

---

[5] The statute of limitations in § 1981 cases is that applicable to similar claims under state law. *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 462 (1975). The parties in this case agree that the applicable limitations period under Delaware law is three years.

aggrieved employee therefore should not be expected to resort to litigation until termination actually has occurred. Prior resort to judicial or administrative remedies would be "likely to have the negative side effect of reducing that employee's effectiveness during the balance of his or her term. Working relationships will be injured, if not sundered, and the litigation process will divert attention from the proper fulfillment of job responsibilities." 605 F. 2d, at 712. Finally, the Court of Appeals thought that a rule focusing on the last day of employment would provide a "bright line guide both for the courts and for the victims of discrimination." *Id.*, at 712–713. It therefore reversed and remanded the case to the District Court for trial on the merits of Ricks' discrimination claims. We granted certiorari. 444 U. S. 1070 (1980).

For the reasons that follow, we think that the Court of Appeals erred in holding that the filing limitations periods did not commence to run until June 30, 1975. We agree instead with the District Court that both the Title VII and § 1981 claims were untimely.[6] Accordingly, we reverse.

## II

Title VII requires aggrieved persons to file a complaint with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U. S. C. § 2000e–5 (e).[7] Similarly, § 1981 plaintiffs in Delaware must file suit within three years of the unfavorable employment decision. See n. 5, *supra*. The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment

---

[6] Because the claims were not timely filed, we do not decide whether a claim of national origin discrimination is cognizable under § 1981.

[7] Under certain circumstances, the filing period is extended to 300 days. 42 U. S. C. § 2000e–5 (e); see *Mohasco Corp.* v. *Silver,* 447 U. S. 807 (1980).

decisions that are long past. *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 463–464 (1975); see *United Air Lines, Inc.* v. *Evans,* 431 U. S. 553, 558 (1977).

Determining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the "unlawful employment practice" of which he complains. Ricks now insists that discrimination motivated the College not only in denying him tenure, but also in terminating his employment on June 30, 1975. Tr. of Oral Arg. 25, 26, 31–32. In effect, he is claiming a "continuing violation" of the civil rights laws with the result that the limitations periods did not commence to run until his 1-year "terminal" contract expired. This argument cannot be squared with the allegations of the complaint. Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. *United Air Lines, Inc.* v. *Evans, supra,* at 558. If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.[8]

Indeed, the contrary is true. It appears that termination of employment at Delaware State is a delayed, but inevitable,

---

[8] Sixteen paragraphs in the complaint describe in detail the sequence of events surrounding the tenure denial. Only one paragraph even mentions Ricks' eventual departure from Delaware State, and nothing in that paragraph alleges any fact suggesting discrimination in the termination of Ricks' employment.

The complaint does allege that a variety of unusual incidents occurred during the 1974–1975 school year, including one in which the education department chairman, George W. McLaughlin, physically attacked Ricks. This incident allegedly resulted in McLaughlin's conviction for assault. Counsel for Ricks conceded at oral argument that incidents such as this were not independent acts of discrimination, Tr. of Oral Arg. 29–30, but at most evidence that could be used at a trial.

consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a 1-year "terminal" contract, with explicit notice that his employment would end upon its expiration.

In sum, the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks.[9] That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later. The Court of Appeals for the Ninth Circuit correctly held, in a similar tenure case, that "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." *Abramson* v. *University of Hawaii,* 594 F. 2d 202, 209 (1979) (emphasis added); see *United Air Lines, Inc.* v. *Evans,* 431 U. S., at 558. It is simply insufficient for Ricks to allege that his termination "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." *Id.,* at 557. The emphasis is not upon the effects of earlier employment decisions; rather, it "is [upon] whether any present *violation* exists." *Id.,* at 558 (emphasis in original).

---

[9] Complaints that employment termination resulted from discrimination can present widely varying circumstances. In this case the only alleged discriminatory act is the denial of tenure sought by a college professor, with the termination of employment not occurring until a later date. The application of the general principles discussed herein necessarily must be made on a case-by-case basis.

## III

We conclude for the foregoing reasons that the limitations periods commenced to run when the tenure decision was made and Ricks was notified. The remaining inquiry is the identification of this date.

## A

Three dates have been advanced and argued by the parties. As indicated above, Ricks contended for June 30, 1975, the final date of his "terminal" contract, relying on a continuing-violation theory. This contention fails, as we have shown, because of the absence of any allegations of facts to support it. The Court of Appeals agreed with Ricks that the relevant date was June 30, 1975, but it did so on a different theory. It found that the only alleged discriminatory act was the denial of tenure, 605 F. 2d, at 711, but nevertheless adopted the "final date of employment" rule primarily for policy reasons. *Supra,* at 255–256. Although this view has the virtue of simplicity,[10] the discussion in Part II of this opinion demonstrates its fallacy as a rule of general application. Congress has decided that time limitations periods commence with the date of the "alleged unlawful employment practice." See 42 U. S. C. § 2000e–5 (e). Where, as here, the only challenged employment practice occurs before the termination date, the limitations periods necessarily commence to run before that date.[11] It should not be forgotten that time-limitations provisions themselves promote important interests; "the period

---

[10] Brief for EEOC as *Amicus Curiae* 19–22; 605 F. 2d, at 712–713.

[11] The Court of Appeals also thought it was significant that a final-date-of-employment rule would permit the teacher to conclude his affairs at a school without the acrimony engendered by the filing of an administrative complaint or lawsuit. *Id.,* at 712. It is true that "the filing of a lawsuit might tend to deter efforts at conciliation." *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S., at 461. But this is the "natural effec[t] of the choice Congress has made," *ibid.,* in explicitly requiring that the limitations period commence with the date of the "alleged unlawful employment practice," 42 U. S. C. § 2000e–5 (c).

allowed for instituting suit inevitably reflects a value judg-
ment concerning the point at which the interests in favor of
protecting valid claims are outweighed by the interests in pro-
hibiting the prosecution of stale ones." *Johnson* v. *Railway
Express Agency, Inc.*, 421 U. S., at 463–464.[12]  See *Mohasco
Corp.* v. *Silver*, 447 U. S. 807, 820, 825 (1980).

## B

The EEOC, in its *amicus* brief, contends in the alternative
for a different date.  It was not until September 12, 1974,
that the Board notified Ricks that his grievance had been
denied.  The EEOC therefore asserts that, for purposes of
computing limitations periods, this was the date of the unfa-
vorable tenure decision.[13]  Two possible lines of reasoning
underlie this argument.  First, it could be contended that the
Trustees' initial decision was only an expression of intent
that did not become final until the grievance was denied.  In
support of this argument, the EEOC notes that the June 26
letter explicitly held out to Ricks the possibility that he
would receive tenure if the Board sustained his grievance.
See n. 2, *supra.*  Second, even if the Board's first decision

---

[12] It is conceivable that the Court of Appeals' "final day of employment"
rule might discourage colleges even from offering a "grace period," such
as Delaware State's practice of 1-year "terminal" contracts, during which
the junior faculty member not offered tenure may seek a teaching position
elsewhere.

[13] If September 12 were the critical date, the § 1981 claim would be
timely.  Counting from September 12, the Title VII claim also would
be timely if Ricks is entitled to 300 days, rather than 180 days, in which
to file with the EEOC.  In its brief before this Court, the EEOC as
*amicus curiae* noted that Delaware is a State with its own fair employment
practices agency.  According to the EEOC, therefore, Ricks was entitled
to 300 days to file his complaint.  See n. 7, *supra.*  Because we hold
that the time-limitations periods commenced to run no later than June 26,
1974, we need not decide whether Ricks was entitled to 300 days to file
under Title VII.  Counting from the June 26 date, Ricks' filing with the
EEOC was not timely even with the benefit of the 300-day period.

expressed its official position, it could be argued that the pendency of the grievance should toll the running of the limitations periods.

We do not find either argument to be persuasive. As to the former, we think that the Board of Trustees had made clear well before September 12 that it had formally rejected Ricks' tenure bid. The June 26 letter itself characterized that as the Board's "official position." *Ibid.* It is apparent, of course, that the Board in the June 26 letter indicated a willingness to change its prior decision if Ricks' grievance were found to be meritorious. But entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made.

As to the latter argument, we already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. *Electrical Workers* v. *Robbins & Myers, Inc.,* 429 U. S. 229 (1976).[14] The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made. Cf. *id.,* at 234–235.[15]

## C

The District Court rejected both the June 30, 1975, date and the September 12, 1974, date, and concluded that the limitations periods had commenced to run by June 26, 1974, when the President of the Board notified Ricks that he would be offered a "terminal" contract for the 1974–1975 school

[14] See also B. Schlei & P. Grossman, Employment Discrimination Law 235 (1979 Supp.), and cases cited therein.

[15] We do not suggest that aspirants for academic tenure should ignore available opportunities to request reconsideration. Mere requests to reconsider, however, cannot extend the limitations periods applicable to the civil rights laws.

year. We cannot say that this decision was erroneous. By June 26, the tenure committee had twice recommended that Ricks not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny Ricks tenure.[16] In light of this unbroken array of negative decisions, the District Court was justified in concluding that the College had established its official position—and made that position apparent to Ricks—no later than June 26, 1974.[17]

We therefore reverse the decision of the Court of Appeals and remand to that court so that it may reinstate the District Court's order dismissing the complaint.

*Reversed and remanded.*

JUSTICE STEWART, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

I agree with the Court that the unlawful employment practice alleged in the respondent's complaint was a discrimina-

---

[16] We recognize, of course, that the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes. See *Oscar Mayer & Co.* v. *Evans,* 441 U. S. 750, 761 (1979); *Love* v. *Pullman Co.,* 404 U. S. 522, 526–527 (1972). But, for the reasons we have stated, there can be no claim here that Ricks was not abundantly forewarned. In *NLRB* v. *Yeshiva University,* 444 U. S. 672, 677 (1980), we noted that university boards of trustees customarily rely on the professional expertise of the tenured faculty, particularly with respect to decisions about hiring, tenure, termination, and promotion. Thus, the action of the Board of Trustees on March 13, 1974, affirming the faculty recommendation, was entirely predictable. The Board's letter of June 26, 1974, simply repeated to Ricks the Board's official position and acknowledged the pendency of the grievance through which Ricks hoped to persuade the Board to change that position.

[17] We need not decide whether the District Court correctly focused on the June 26 date, rather than the date the Board communicated to Ricks its unfavorable tenure decision made at the March 13, 1974, meeting. As we have stated, see n. 13, *supra,* both the Title VII and § 1981 complaints were not timely filed even counting from the June 26 date.

tory denial of tenure, not a discriminatory termination of employment. See *ante*, at 257–259, and nn. 8, 9. Nevertheless, I believe that a fair reading of the complaint reveals a plausible allegation that the College actually denied Ricks tenure on September 12, 1974, the date on which the Board finally confirmed its decision to accept the faculty's recommendation that he not be given tenure.

Therefore, unlike the Court, I think Ricks should be allowed to prove to the District Court that the allegedly unlawful denial of tenure occurred on that date.[1] As noted by the Court, see *ante*, at 260, n. 13, if Ricks succeeds in this proof, his § 1981 claim would certainly be timely, and the timeliness of his Title VII claim would then depend on whether his filing of a complaint with the Delaware Department of Labor entitled him to file his EEOC charge within 300 days of the discriminatory act, rather than within the 180 days' limitation that the Court of Appeals and the District Court assumed to be applicable.[2]

A brief examination of the June 26, 1974, letter to Ricks

---

[1] The Court treats the District Court's determination of June 26, 1974, as the date of tenure denial as a factual finding which is not clearly erroneous. *Ante*, at 261–262. But it must be stressed that the District Court dismissed Ricks' claims on the pleadings, and so never made factual determinations on this or any other issue.

[2] Title VII would allow Ricks 300 days if he had "initially instituted" proceedings with a local or state agency with authority to grant him relief. 42 U. S. C. § 2000e–5 (e); see *Mohasco Corp.* v. *Silver*, 447 U. S. 807. To benefit from this provision, however, Ricks would arguably have had to make a timely filing with the state agency. Delaware law requires that a charge of discrimination be filed with the Department of Labor within 90 days after the allegedly discriminatory practice occurred or within 120 days after the practice is discovered, whichever date is later. Del. Code Ann., Tit. 19, § 712 (d) (1979). Neither the District Court nor the Court of Appeals considered the timeliness of Ricks' filing with the state agency, nor the significance of the state agency's action in waiving jurisdiction over Ricks' charge, and so these questions would be appropriately addressed on remand.

from the Board of Trustees, quoted by the Court, *ante,* at 253, n. 2, provides a reasonable basis for the allegation that the College did not effectively deny Ricks tenure until September 12. The letter informed Ricks of the Board's "intent not to renew" his contract at the end of the 1974–1975 academic year. And the letter suggested that the Board was so informing Ricks at that time only to ensure technical compliance with College and American Association of University Professors requirements in case it should *later* decide to abide by its earlier acceptance of the faculty's recommendation that Ricks be denied tenure. The Board expressly stated in the letter that it had "no way of knowing" what the outcome of the grievance process might be, but that a decision of the Board's Educational Policy Committee favorable to Ricks would "of course . . . supersede any previous action taken by the Board."

Thus, the Board itself may have regarded its earlier actions as tentative or preliminary, pending a thorough review triggered by the respondent's request to the Committee. The Court acknowledges that this letter expresses the Board's willingness to change its earlier view on Ricks' tenure, but considers the grievance procedure under which the decision might have been changed to be a remedy for an earlier tenure decision and not a part of the overall process of making the initial tenure decision. Ricks, however, may be able to prove to the District Court that at his College the original Board response to the faculty's recommendation was not a virtually final action subject to reopening only in the most extreme cases, but a preliminary decision to advance the tenure question to the Board's grievance committee as the next conventional stage in the process.[3]

---

[3] This view is consistent with the policies and model procedures of the American Association of University Professors, AAUP Policy Documents and Reports 15, 29 (1977); see *Board of Regents* v. *Roth,* 408 U. S. 564, 578–579, and n. 17; Brief for AAUP as *Amicus Curiae* 9–10, on whose

Whether this is an accurate view of the tenure process at Delaware State College is, of course, a factual question we cannot resolve here. But Ricks lost his case in the trial court on a motion to dismiss. I think that motion was wrongly granted, and that Ricks was entitled to a hearing and a determination of this factual issue. See *Abramson* v. *University of Hawaii,* 594 F. 2d 202 (CA9).

I would, therefore, vacate the judgment of the Court of Appeals and remand the case to the District Court so that it can make this determination and then, if necessary, resolve whether Title VII allowed Ricks 300 days from the denial of tenure to file his charge with the Commission.

JUSTICE STEVENS, dissenting.

The custom widely followed by colleges and universities of offering a 1-year terminal contract immediately after making an adverse tenure decision is, in my judgment, analogous to the custom in many other personnel relationships of giving an employee two weeks' advance notice of discharge. My evaluation of this case can perhaps best be explained by that analogy.

Three different reference points could arguably determine when a cause of action for a discriminatory discharge accrues: (1) when the employer decides to terminate the relationship; (2) when notice of termination is given to the employee; and (3) when the discharge becomes effective. The most sensible rule would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitations begins to run. Prior to that date, the allegedly wrongful act is subject to change; more importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute.[1]

---

requirements the Board of Trustees in this case expressly relied in explaining its action in the June 26 letter.

[1] Although few courts have had the occasion to consider the issue in

I would apply the same reasoning here in identifying the date on which respondent's allegedly discriminatory discharge became actionable. See *Egelston* v. *State University College at Geneseo,* 535 F. 2d 752, 755 (CA2 1976). Thus under my analysis the statute of limitations began to run on June 30, 1975, the termination date of respondent's 1-year contract. In reaching that conclusion, I do not characterize the College's discharge decision as a "continuing violation"; nor do I suggest that a teacher who is denied tenure and who remains in a school's employ for an indefinite period could file a timely complaint based on the tenure decision when he or she is ultimately discharged. Rather, I regard a case such as this one, in which a college denies tenure and offers a terminal 1-year contract as part of the adverse tenure decision, as a discharge case. The decision to deny tenure in this situation is in all respects comparable to another employer's decision to discharge an employee and, in due course, to give the employee notice of the effective date of that discharge. Both the interest in harmonious working relations during the terminal period of the employment relationship,[2] and the inter-

the context of notice of discharge preceding actual termination, some courts have recognized that the date on which the employee actually ceases to perform services for the employer, and not a later date when the payment of benefits or accrued vacation time ceases, should determine the running of the statute of limitations. See *Bonham* v. *Dresser Industries, Inc.,* 569 F. 2d 187, 192 (CA3 1977), cert. denied, 439 U. S. 821 (1978); *Krzyzewski* v. *Metropolitan Government of Nashville and Davidson County,* 584 F. 2d 802, 804–805 (CA6 1978).

[2] This interest has special force in the college setting. Because the employee must file a charge with the EEOC within 180 days after the occurrence, the Court's analysis will necessitate the filing of a charge while the teacher is still employed. The filing of such a charge may prejudice any pending reconsideration of the tenure decision and also may impair the teacher's performance of his or her regular duties. Neither of these adverse consequences would be present in a discharge following a relatively short notice such as two weeks.

est in certainty that is so important in litigation of this kind,[3] support this result.

For these reasons, I would affirm the judgment of the Court of Appeals.

---

[3] The interest in certainty lies not only in choosing the most easily identifiable date, but also in avoiding the involvement of the EEOC until the school's decision to deny tenure is final. The American Association of University Professors, as *amicus curiae* here, has indicated that under the "prevailing academic employment practices" of American higher education, which allow for maximum flexibility in tenure decisions, initial tenure determinations are often reconsidered, and the reconsideration process may take the better part of the terminal contract year. Brief for American Association of University Professors as *Amicus Curiae* 6–11.