**Dr. Joseph CARPENTER, Plaintiff,**

v.

**BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant.**

No. 79–C–207.

United States District Court, W. D. Wisconsin.

Jan. 11, 1982.

Jeff Scott Olson of Julian, Olson & Crandall, Madison, Wis., for plaintiff.

Nadim Sahar, Asst. Atty. Gen. of Wisconsin, Madison, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action alleging a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff claims he was denied tenure by defendant because of his race. Defendant has moved to dismiss for lack of subject matter jurisdiction on the ground that plaintiff failed to file in a timely manner his charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

The issue to be resolved in this order is whether defendant's motion to dismiss should be granted because plaintiff failed to

file his charge with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e).[1] The burden of proof in this question is on the plaintiff. He must show by a preponderance of the evidence that subject matter jurisdiction is present. The parties have been instructed to comment on the application of *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), to the pending motion in this case.[2]

### Facts

On August 5 and October 1, 1981, an evidentiary hearing was conducted on defendant's motion. On the basis of the record of that hearing and the admitted allegations of the complaint, I find:

Plaintiff, a black man, was hired in 1972 by the University of Wisconsin at Milwaukee (UWM) to serve as an assistant professor in the Afro-American Studies Department. Plaintiff's appointment was probationary. A professor can remain on probationary status for only a given number of years before he or she must either be granted tenure or not retained.

During plaintiff's next-to-last possible year as an untenured professor (the 1975–76 academic year), he was considered for promotion to the rank of Associate Professor with tenure. In December of 1975, according to established university policy, plaintiff submitted his vita and supporting documents to the Executive Committee of the Department of Afro-American Studies. On December 8, 1975, the Executive Committee voted three in favor, one opposed, with one abstention, to recommend plaintiff for promotion to the rank of Associate Professor with tenure.

On January 27, 1976, the Executive Committee of the Division of Professions voted unanimously that plaintiff be promoted to the rank of Associate Professor with tenure.

The next level of review of plaintiff's application for promotion was the Dean of the College of Letters and Sciences, William F. Halloran. On April 7, 1976, Dean Halloran formally advised plaintiff by letter that the dean could not support the recommendation of the Executive Committee of the Department of Afro-American Studies that plaintiff be promoted to the rank of Associate Professor with tenure. He continued, "I must, in accord with Sections 5.176 and 5.19 of the *Policies and Procedures of The University of Wisconsin-Milwaukee*, notify you that you will not be retained as a member of the faculty beyond the 1976–77 academic year." In response to plaintiff's request for the reasons underlying this position, the dean wrote, on April 19, 1976, "your scholarly accomplishments—research, writing, and publication—are not strong enough to warrant my support for your promotion and tenure."

Following established procedures, plaintiff requested reconsideration by Dean Halloran. In his request, plaintiff set forth further substantive material in support of his application. Plaintiff presented his case for reconsideration in an open meeting. By letter to plaintiff, dated June 15, 1976, the dean refused to change his position.

After the dean's final nonrenewal decision, issued on June 15, 1976, plaintiff sought and gained review by the University Committee. The University Committee reviewed the dean's decision for procedural inaccuracies and "abuse of professional academic judgment," finding no grounds for procedural challenge and no proof of use of improper evidence. By letter dated July 28, 1976, the Committee notified plaintiff of its determination.

---

1. In states that have their own fair employment practice agencies, so-called "deferral states," claimants are subject to a 300-day limitations period within which they must file their charges. 42 U.S.C. § 2000e–5(e). Wisconsin has such an agency, the Wisconsin Equal Rights Division (WERD), which considered plaintiff's charge.

2. In an earlier order I stated that if the court decides the discriminatory act in this case occurred at a time earlier than the date of the action of the chancellor, counsel for plaintiff will still have the opportunity to submit other contentions on the limitations issue.

Following the decision of the University Committee, plaintiff wrote to the chancellor, who replied on August 16, 1976, as follows:

This is in further response to your letter of July 30, concerning the non-renewal you have received from Dean Halloran.

Now that the University Committee has completed a review of your situation, it is appropriate for me to entertain an appeal. That appeal, however, must be specific rather than general. I will not review the case in its entirety, anew, though I will address myself to particular errors you may perceive.

Insofar as your appeal may be based on procedural grounds, precisely what were the departures you perceived from the processes established by the faculty and regents for the use of faculty members for advancement to tenure status?

Insofar as your appeal may be based on substantive grounds, precisely which judgments do you believe to have been incorrect and why?

As soon as possible after I have received your "bill of particulars," I will seek to satisfy myself of the merits of each point and act accordingly.

Plaintiff responded with a copy of his vita and a five page letter, dated August 31, 1976, which opens with the statement, "I am remitting my appeal to you for a substantive review of Dean William F. Halloran's decision not to support recommendations that I be granted tenure." The letter presents information on plaintiff's accomplishments during his employment at UWM.

On September 27, 1976, Chancellor Baum notified plaintiff that the dean's decision would be sustained. In his letter, he noted, "The case is unprecedented in my years at UWM and apparently in institutional history." He described plaintiff's position as follows: "Your appeal focuses on one issue only: the professional judgment of the executive and divisional committees involved led to one conclusion, the professional judgment of the Dean led to a different conclusion, and you ask that the Dean's be set aside." He wrote, "for me to accept your appeal reduces to my substituting a different professional judgment for that of the Dean." The chancellor cited the dean's proximity to the faculty's daily operation as one reason for his decision. The other basis for his affirmance, he stated, was to preserve the integrity of the tenure system. Since tenure is a substantial obligation incurred by an institution, "the case for granting tenure must be clearly established," and "any reasonable doubt must be resolved in favor of the institution."

After the chancellor's decision, plaintiff asked the president of the University of Wisconsin System, John Weaver, to undertake, with the Board of Regents, a substantive review of the dean's decision. On November 5, 1976, the president found no authority for an appeal of this nature: "It is clear that the relevant rules do not provide for an appeal to the Regents asking for review of a decision not to recommend tenure, and the non-renewal of contract which accompanies such a decision. In such cases, the decision of the Chancellor is final." President Weaver suggested to the chancellor that an additional *ad hoc* faculty review of the substance of the decision might be in order, but by November 29, 1976, the chancellor and the University Committee had decided such a review would not be appropriate, and on December 7, 1976, the president concurred in that judgment.

On April 25, 1977, plaintiff again asked the dean to reconsider his decision, and on May 2, 1977, the dean denied this request. During the week of May 22, 1977, the *ad hoc* Executive Committee of the Afro-American Studies Department voted to reaffirm its recommendation that plaintiff be granted tenure. On November 22, 1977, the Executive Committee of the Division of Professions voted again to promote and grant tenure to plaintiff. Both committees forwarded their recommendations to Dean Halloran. On January 10, 1978, he refused to reconsider his position, stating that because of the lateness of the recommendations, substantive review by the dean would not be in accord with the UWM rules gov-

erning personnel actions. Plaintiff then asked Chancellor Baum for a second review. On February 24, 1978, the chancellor wrote to plaintiff, stating that in response to plaintiff's request, the chancellor had "again reviewed the decision" on tenure, and that "with respect to the substance of the issue, it is now quite clear that Dean Halloran's original judgment was sound."

In its answer to the first amended complaint in this court, defendant "admits that the final level of review on its merits of the plaintiff's application was the Chancellor of the University of Wisconsin at Milwaukee . . . ."

As of about August 16, 1976, when plaintiff received the chancellor's letter of that date, and through August 31, 1976, when plaintiff submitted materials to the chancellor, plaintiff believed that the final decision on the merits of his case had not been made within the University of Wisconsin at Milwaukee, and that a decision on the merits would be made by the chancellor.

Plaintiff's teaching contract was not renewed and his appointment expired at the end of the 1976–77 academic year.

On April 18, 1977, plaintiff's charge of discrimination on the basis of race was filed with the EEOC, and on April 20, 1977, notice of plaintiff's charge was served on defendant. April 18, 1977, was the 300th day after June 22, 1976.

On or about February 13, 1979, plaintiff received a "Notice of Right to Sue" from the United States. The present action was commenced on May 11, 1979.

Wis.Stat. § 36.09(3) provides that "The chancellors shall be the executive heads of their respective faculties and institutions and shall be vested with the responsibility of administering board [of regents] policies under the coordinating direction of the president . . . . [T]he chancellors of the institution in consultation with their faculties shall be responsible for . . . screening candidates for appointment, promotion and tenure . . . ." Wis.Stat. § 36.13(3) instructs the board of regents and its faculties to "adopt rules for tenure and probationary appointments, and the review of faculty performance and for the nonretention and dismissal of faculty members." Wis.Adm. Code UWS § 3.06(a) states, "Appointments may be granted only upon the affirmative recommendation of the appropriate academic department, or its functional equivalent, and the chancellor of an institution." Wis.Adm.Code UWS § 3.08 requires the faculty and chancellor of each institution to establish rules and procedures for appeals of nonrenewal decisions.

The University of Wisconsin-Milwaukee had adopted rules governing tenure decisions. The University of Wisconsin-Milwaukee Policies and Procedures (March 5, 1976) (Policies and Procedures). Section 5.10 [3] requires that tenure appointments be approved by an academic department's executive committee, the dean, and the chancellor. Section 5.176 [4] says that a nonrenewal notice from the dean is effective upon its issuance and that subsequent appeals do not extend the time limits in § 5.19, Policies and Procedures. Section 5.19 sets forth the university's notice requirements for reappointment and nonretention decisions. In plaintiff's case, notice was required to be given at least 12 months before expiration of his appointment. Section 5.19(c), Policies and Procedures. If a faculty member is not notified of a nonretention decision within the time period specified in § 5.19, he or she is entitled to a one-year terminal appointment. Section 5.19, Policies and Procedures.

**3.** 5.10 *Tenure Appointment.* Tenure appointment means an appointment for an unlimited period granted to a ranked faculty member by the Board of Regents upon the affirmative recommendation of the executive committee of the appropriate academic department or its functional equivalent, the dean of the college or school, and the Chancellor.

**4.** 5.176 *Dean's Action on Positive Recommendation.*

(3) A non-renewal notice is effective upon its issuance by the dean. The time limits, as stated in 5.19 for issuing a non-renewal notice, are not extended by subsequent hearing or subsequent appeals.

The Policies and Procedures assign responsibility for hearing appeals to the University Committee only. Sections 5.181 and 183.[5] The function of the chancellor in the tenure process is not addressed, and there is no indication whether review by the chancellor is another stage of tenure decision-making on the merits, or is more analogous to a grievance procedure.

Had the chancellor chosen to do so, despite the action by the dean, it was within his power to recommend to the president and the board of regents that plaintiff be granted tenure.

### Opinion

The court must determine the point at which defendant denied plaintiff's tenure application. In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Court faced a similar question. The plaintiff in *Ricks* was a faculty member whose tenure application was denied. In contrast to the tenure decision in this case, however, the first two levels of decision-making in *Ricks* were recommendations that he not receive tenure. The third stage in *Ricks* was a vote by the board of trustees to support the earlier negative recommendations. Ricks then filed a grievance with the board's educational policy committee (grievance committee). *Id.* 101 S.Ct. at 501. The grievance committee considered the board's decision, apparently with some attention to the substance of that decision,[6] and eventually denied the grievance. Ricks was given a one-year "terminal" contract that expired in June of the following year.

In *Ricks*, the plaintiff argued that the Title VII limitations period should commence with the final date of his employment. *Id.* at 504. The EEOC contended that the date on which the grievance committee denied plaintiff's claim should be considered the operative date. *Id.* at 505. The Supreme Court rejected both of these positions. The tenure denial, not the employment termination, was the "alleged unlawful employment practice" Title VII sets as the event commencing the limitations period, according to the Court. Moreover, the Court said the official tenure denial took place in *Ricks* when the Board of Trustees first notified the plaintiff of its position. "[E]ntertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." *Id.* at 506. Thus, even though the board told Ricks it would alter its decision if the review committee subsequently recommended that tenure be granted and the board concurred in that recommendation, the board's position was "final" for purposes of the limitations period after its first rejection. "Mere requests to reconsider [a tenure denial], cannot extend the limitations periods applicable to the civil rights laws," the Court asserted. *Id.* at 506 n. 15. In summary, the Court in *Ricks* held that an institution's final decision on the merits of a tenure application is the "alleged unlawful employment practice" Congress intended to commence the running of the Title VII limitations period.

5. 5.181 *Appeals on Procedural Issues.* Appeals on procedural and nonacademic issues may be brought to the University Committee at any time during or after any of the above proceedings.

    5.183 *Appeals on Academic Issues.* Normally the decisions of a departmental executive committee or a divisional executive committee are conclusive on academic issues. The University Committee, if it judges the circumstances to be unique, may consider academic appeals.

6. In a letter to Ricks, the college president said, "Should the Educational Policy Committee de-

cide to recommend that you be granted tenure, and should the Board of Trustees concur with their recommendation, then of course, it will supersede any previous action taken by the Board." *Delaware State College v. Ricks*, 101 S.Ct. at 501–02 n. 2. This statement implies that the review committee had the power to overturn the board's substantive findings. In addition, the record in *Ricks* indicates that the educational policy committee hearing furnished an opportunity for plaintiff to be heard on all aspects of the denial. Exhibit "A" to Answer (letter from plaintiff to college president); Brief for *amicus curiae* EEOC, at 26–29.

■■ Limitations periods reflect "a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecutions of stale ones." *Johnson v. Railway Express Agency*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975). When the legal process must be initiated by laypersons without professional legal advice, the limitations requirement should be construed in a manner comprehensible to such persons. *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 761, 99 S.Ct. 2066, 2074, 60 L.Ed.2d 609 (1979); *Love v. Pullman*, 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1971). As the Supreme Court noted in *Ricks*, "the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." 101 S.Ct. at 506 n. 16. Thus, it is appropriate to apply a "reasonable person" standard when determining the point at which the Title VII limitations period should begin to run.

The essential question to be resolved, then, is the date on which a reasonable person in plaintiff's position would have been put on notice of defendant's official and final decision on the merits, taking into account the Court's construction in *Ricks* of the Title VII limitations provision. More specifically, in light of the reasonable person standard and *Ricks*, should the limitations period begin to run at the time plaintiff was notified of the dean's decision, or at the time plaintiff was notified of the chancellor's decision? If it was reasonable for plaintiff to believe that yet another intra-institutional level of decision-making on the merits of his application remained after Dean Halloran had decided against granting plaintiff tenure, then the dean's decision did not trigger the running of the limitations period.

The statutes, rules, and regulations governing the tenure application process are formal guidelines of which plaintiff should have been aware when he pursued his case at UWM. Consequently, I will examine the relevant guidelines to determine whether a reasonable person in the plaintiff's position would have been put on notice that the decision by the dean was the final decision on the merits of plaintiff's tenure case, and that the chancellor would make no further decision on the merits of plaintiff's case. Further, I will scrutinize the guidelines to ascertain whether a reasonable person could interpret them to authorize the chancellor to decide the merits of a tenure application following the dean's decision to deny tenure. In examining the formal guidelines, I do not intend to set forth definitive constructions of them; I look to them only to discover what knowledge the plaintiff reasonably could have been expected to gain from them.

Defendant argues that, based on the Policies and Procedures, a positive tenure decision requires an affirmative decision at each of four levels: the executive committees of the academic department and the division of professions; the dean of the college; the chancellor; and the board of regents. Defendants claim, on the other hand, that a dean's decision to deny tenure is official and binding. Within this framework, then, defendants say the dean's decision in this case was the university's final position on plaintiff's tenure application. Section 5.176(3), Policies and Procedures, n. 4 *infra*, is the only provision in the university's formal rules that could be cited as explicit support for defendant's argument. Plaintiff, however, argues that this section applies only for purposes of the time limits in § 5.19, which provides for notice to faculty members of nonretention decisions. *See* p. 529 *supra*.

■ By promulgating § 5.19 the university has bestowed upon its faculty members an entitlement to a certain period of notice after nonrenewal decisions are made, but before the expiration of the appointments. That entitlement is limited by § 5.176, which provides that the dean's nonrenewal notice marks the point back to which the notice periods in § 5.19 are measured. Section 5.176 does not say that the dean has the ultimate power to deny tenure, or that the dean's decision not to renew is final.

As applied to plaintiff's case, § 5.176 says only that, in the event that defendant's eventual and final decision was to deny plaintiff tenure, notice of the dean's decision at least 12 months before the end of the 1976–77 academic year was sufficient to deprive plaintiff of a one-year terminal appointment in 1977–78. Thus, § 5.176 fails to furnish authority from which plaintiff could reasonably be expected to discern that the decision was the university's final position on the merits of the tenure question and that the EEOC limitations period would begin to run at that time.

The Wisconsin statutes, rules, and regulations do not clearly categorize Chancellor Baum's review as either a final level of decision on the merits of plaintiff's tenure application or as a review analogous to that performed by the grievance committee in *Ricks.* The laws and regulations are silent on the nature of a chancellor's review of a tenure application and apparently no standard practice existed characterizing that review. Plaintiff's belief that the chancellor's review was a continuation of internal consideration of the merits of his tenure application was reasonable. As a layperson, he could not have been expected to make the judgment that the chancellor's review was closer to a grievance mechanism than to a consideration of the merits of his qualifications for tenure. Indeed, the statutes and regulations would not permit even an attorney to make such a judgment with certainty. Defendant's answer in this lawsuit, filed by the Wisconsin Attorney General on defendant's behalf and submitted well after the issues in the case had crystallized, admits that the final level of review on the merits of plaintiff's tenure application was the chancellor's review. Thus, the formal rules governing the tenure process fail to supply a basis upon which a person in plaintiff's position could have been expected to know, at the time he received notice of the dean's decision, that it represented the university's final position on the merits of his tenure application and that consideration of the merits by the chancellor was not available.

Plaintiff's communications with university administrators shaped his understanding of the review process. The chancellor's letter of August 16, 1976, describing the review he would perform, fails to characterize his anticipated review precisely as either a grievance or a review on the merits. In his letter, Chancellor Baum invited plaintiff to submit substantive grounds for plaintiff's belief that the dean should be overruled and tenure should be granted. This statement furnishes an objective basis upon which plaintiff could have inferred that the chancellor would consider the tenure decision on its merits.

The facts in this case vary from those in *Ricks.* Here, plaintiff was not "abundantly forewarned" by an "unbroken array of negative decisions" that defendant's official position was denial of the tenure application. *Delaware State College v. Ricks,* 101 S.Ct. 498, 506 & n. 16. Unlike the plaintiff in *Ricks,* this plaintiff had a legitimate expectation that tenure would be granted based on the affirmative recommendations of two executive committees. *See* § 5.183, Policies and Procedures, n. 6 *infra.* Plaintiff could reasonably have viewed the dean's decision as "an expression of intent that did not become final" until the chancellor's decision was issued. 101 S.Ct. at 505. Defendant's established rules did not give plaintiff reason to know that his appeal to the chancellor was more a procedure to remedy the dean's decision than an opportunity to influence the final level of tenure decision-making on the merits. *See id.* at 506.

I have found as a fact that plaintiff believed the final tenure decision on the merits was not made before the chancellor's first decision, which was issued on September 27, 1976. I also have found as a fact that Chancellor Baum had the ultimate power over plaintiff's tenure decision, and that the chancellor could have overruled the dean, granting plaintiff's application for tenure. The information contained in the chancellor's letter of August 16, 1976, inviting plaintiff's appeal, together with the ambiguity of the statutes, rules, and regulations concerning the tenure process, further support the reasonableness of plaintiff's be-

lief that an additional decision on the merits of his application remained to be made within the UWM administration after Dean Halloran had issued his nonrenewal notice.

Under these circumstances, then, plaintiff was not made aware of defendant's official position until Chancellor Baum notified plaintiff that the dean's decision, not the executive committees' decisions, would be upheld. Thus, the date on which the chancellor wrote to plaintiff expressing the conclusion of the chancellor's first review, September 27, 1976, is the date on which the alleged unlawful employment practice occurred and the date on which the Title VII limitations period commenced in this case. April 18, 1977, the day on which plaintiff's charge was filed with the EEOC was fewer than 300 days after September 27, 1976.

### Order

It is ordered that defendant's motion to dismiss for lack of subject matter jurisdiction on the ground that plaintiff failed to file in a timely manner his charge with the EEOC is hereby denied.

It is further ordered that the clerk of court schedule a pretrial conference at the earliest practicable time, to be conducted by the Honorable William L. Gansner, United States Magistrate.