Frances REID, Plaintiff,

v.

The UNIVERSITY OF MICHIGAN, Defendant.

No. 84–CV–7365–AA.

United States District Court, E.D. Michigan, S.D.

June 28, 1985.

Frances Reid, in pro per.

Robert M. Vercruysse, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendant.

## OPINION AND ORDER

FEIKENS, Chief Judge.

This action is brought *pro se* by Frances Reid ("plaintiff") alleging that the University of Michigan discriminated against her on the basis of race and sex in denying her tenure as a professor. Defendant has moved for dismissal or summary judgment claiming that the alleged discrimination occurred more than 300 days before the filing of plaintiff's complaint with the Equal Employment Opportunity Commission ("EEOC") and this action is thus time-barred by section 706(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e) (1982). After considering the parties' legal arguments and supporting affidavits with great care, I conclude that the motion for summary judgment or dismissal must be denied.

## I. BACKGROUND

Before stating the facts pertinent to this motion, I will note certain undisputed points in order to focus the issue before me. Plaintiff filed a complaint with the EEOC on February 22, 1980. Defendant argues that such an action must be filed within 300 days after the alleged unlawful employment practice occurred or plaintiff's claim will be time-barred, 42 U.S.C. § 2000e–5(e) (1982), and plaintiff does not contest this claim. Hence, defendant is claiming it is entitled to summary relief

unless plaintiff alleges that unlawful discrimination occurred on or after April 29, 1979, and I find that these allegations are sufficient to create a genuine issue of material fact.[1]

Determining whether an "unlawful employment practice" occurred within the actionable period in this case is not an easy matter. As I will elaborate, the decision-making process challenged here began in 1977 and—in plaintiff's view—did not end until early 1980. Defendant's position is that its decision to deny plaintiff tenure was made in December, 1977, and subsequent proceedings were merely unsuccessful attempts by plaintiff to obtain reconsideration and reversal of this decision.

In chronicling the different steps in this decision-making process and indicating when the alleged discrimination occurred, I must consider the evidence in the record "together with all inferences to be drawn therefrom ... in the light most favorable to the party opposing the motion" for summary disposition. *Watkins v. Northwestern Ohio Tractor Pullers Association,* 630 F.2d 1155, 1158 (6th Cir.1980). "The movant's papers are to be closely scrutinized while those of the opponent are to be viewed indulgently." 630 F.2d at 1158. This indulgence is particularly important in a case such as this where the plaintiff is proceeding *pro se. See Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305, 1310 (5th Cir.1977) ("District courts should be sensitive to the problems faced by *pro se* litigants and innovative in their responses to them."). To prevail on this motion, defendant must show "conclusively that there exists no genuine issue as to a material fact." *Watkins,* 630 F.2d at 1158.

Plaintiff acknowledges that the Political Science Department at defendant University decided not to grant her tenure on December 16, 1977 (and gave her written notification of this decision on May 8, 1978). During the ensuing year, plaintiff sought reconsideration of this decision, and at one point the Executive Committee of the Political Science Department recommended that plaintiff be given a temporary appointment. These efforts to improve plaintiff's employment status at the University were ultimately rejected and plaintiff was informed on at least two occasions that her employment with defendant would end with the 1978–79 academic year.

Plaintiff then decided to grieve defendant's tenure decision. On August 31, 1979, a grievance committee found that while there was no showing of impropriety in the original tenure decision, there were "allegations of sexual misconduct against [plaintiff] in January 1978 [that] were intended to, and did indeed, derail what would have been a normal appeal for reconsideration.... All events after January 13, 1978 were affected by it." Plaintiff's Response Brief, Document S. Consequently, the committee concluded that plaintiff's grievance was valid and recommended that she be reconsidered for tenure within the Department. This recommendation was endorsed by the Executive Committee for the College of Literature, Science, and the Arts ("LSA"). The LSA Executive Committee emphasized that because of the "exceptional nature of the case" some modifications from regular procedures might be necessary to guarantee a fair reconsideration of the tenure decision. In particular, it

---

1. Section 706(e) of Title VII provides:
   A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

42 U.S.C. § 2000e–5(e). I do not think it obvious from this statutory language that the 300-day period, rather than the 180-day period, is applicable (although defendant appears content to apply the longer limitations period). Because this difference in the length of the "actionable period" would not cause a different result in my ruling on this motion (the alleged unlawful employment practice occurred within both the 180-day limitation period and the 300-day period), I will assume, without deciding, that the 300-day period is applicable.

recommended that consideration be given to "extraordinary ways in which political scientists external to the Department and/or the University can be involved" in evaluating plaintiff's scholarship and in making recommendations on that facet of her qualifications for tenure. Plaintiff's Response Brief, Document U.

The documents and affidavits submitted by plaintiff support plaintiff's contention that from December, 1979, through January, 1980, defendant made a *de novo* decision on plaintiff's tenure (at the very least, they raise a question of fact on this point). *See* Affidavit of Lawrence B. Mohr; Affidavit of Frances S. Reid; Plaintiff's Response Brief, Document V. This evidence indicates that political science professors outside the University were solicited to review plaintiff's record and make recommendations on tenure. The final tenure decision was made by defendant. On January 17, 1980, plaintiff was notified that her position with defendant was terminated as of August 31, 1979. On February 14, 1980, she was further notified that the LSA Executive Committee had decided against granting her tenure.

Plaintiff filed an EEOC complaint on February 22, 1980. On August 1, 1984, after receiving a right to sue letter from the EEOC, plaintiff filed the action now before me. She alleges in her complaint that her qualifications were as strong or stronger than those of males and non-minorities accepted for tenure, that the tenure decision was prejudiced by false accusations that she had secured support for her tenure by granting sexual favors, and that these slanderous allegations were made again and negatively affected the *de novo* consideration of plaintiff's tenure petition.

Defendant then filed this motion arguing that plaintiff's claims were time-barred as a matter of law. A hearing on the motion was scheduled but plaintiff did not appear. The Court contacted plaintiff by telephone to determine whether she intended to pursue the case and, if so, to instruct her to either make an appearance before the Court, or submit affidavits, to indicate the specific acts of discrimination that she claims occurred within the actionable period. As plaintiff stated her preference to file affidavits in lieu of a hearing on the motion, and has filed the requested affidavits, I am now prepared to rule on the motion.

## II. DISCUSSION

As I have indicated, the parties agree that plaintiff must allege that an unlawful employment practice occurred on or after April 29, 1979. In arguing that the discriminatory event being challenged here occurred before that date, defendant relies on the rule articulated in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In *Ricks*, the United States Supreme Court held that the unlawful employment practice in the case before it occurred "at the time the tenure decision was made and communicated" to the plaintiff; the actual termination of the plaintiff was merely a consequence of that decision and did not constitute continuing or independently actionable discriminatory conduct. Because the unlawful employment practice complained of—the tenure decision—did not occur within the actionable period (in that case, within 180 days of the filing of the EEOC complaint), the action was time-barred.

The Court rejected the plaintiff's contention that the pendency of grievance proceedings tolled the running of the limitations period. The Court reasoned that these proceedings did "not suggest that the earlier decision [denying tenure] was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." 449 U.S. at 261, 101 S.Ct. at 506. *See also Kessler v. Board of Regents*, 738 F.2d 751 (6th Cir.1984); *Garland v. Shapiro*, 579 F.Supp. 858 (E.D.Mich.1984); *Beamer v. Regents of the University of Michigan*, No. 81–73113 (E.D.Mich.1982).

Defendant argues that *Ricks* is controlling here. According to defendant, if there

was an unlawful employment practice in this case it occurred at the time plaintiff was notified that tenure was denied; subsequent grievance proceedings constituted neither continuing discrimination nor a discriminatory event that might be viewed as independent of the original tenure decision.

Defendant's analysis ignores a significant difference between this case and *Ricks*. In this case, defendant decided that its original decision-making process was flawed and then made a *de novo* tenure decision within the actionable period. In contrast, in concluding that the unlawful employment practice in *Ricks* occurred on June 26, 1974 (before the actionable period), the Supreme Court explained that:

> By June 26, the tenure committee had twice recommended that Ricks not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny Ricks tenure. *In light of this unbroken array of negative decisions,* the District Court was justified in concluding that the College had established its official position—and made that position apparent to *Ricks* —no later than June 26, 1974.

449 U.S. at 262, 101 S.Ct. at 506 (emphasis added) (footnotes omitted). The importance of this difference must be carefully considered in view of the admonition in *Ricks* that "[c]omplaints that employment termination resulted from discrimination can present widely varying circumstances.... The application of the general principles discussed herein necessarily must be made on a case-by-case basis." 449 U.S. at 258 n. 9, 101 S.Ct. at 504 n. 9.

■ On the facts alleged in this case, I think plaintiff is entitled to show that defendant discriminated against her when, after a *de novo* tenure decision, it denied her tenure and notified her of this fact early in 1980. Plaintiff alleges that in this tenure decision she was treated differently than males and non-minorities both procedurally (because a more burdensome decision-making process was employed) and substantively (because innuendos that ar-

guably were sex-based influenced the decision-makers and, as a result, plaintiff was denied tenure even though she was more qualified than males and non-minorities who have been granted tenure). If plaintiff can prove that the *de novo* decision was discriminatory in these respects, that decision would be an unlawful employment practice occurring within the actionable period. *Ricks* expressly indicates that even where a tenure decision was made earlier, the limitations period will commence at the date of discharge where "the manner in which ... employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure." 449 U.S. at 258, 101 S.Ct. at 504. The same conclusion is required when such discriminatory treatment infects a *de novo* tenure decision.

A different result would, in effect, require plaintiffs to commence suits against institutions such as this defendant even when the defendant has acknowledged irregularities in its original decision and agreed to proceed *de novo*. Requiring plaintiffs to bypass the administrative process by initiating litigation in these circumstances would be completely incongruous with the wealth of case law demanding exhaustion of administrative remedies. Indeed, the wisdom of allowing the administrative process to run its course is especially compelling when university tenure decisions are at issue, for such decisions necessarily call on the expertise of the university in a very difficult, and perhaps somewhat subjective, matter.

■ In short, I conclude that plaintiff is entitled to challenge sex or race discrimination in defendant's *de novo* tenure decision in early 1980. I also conclude that plaintiff has made sufficient allegations of discrimination in the *de novo* decision to raise a genuine issue of fact. Although many of plaintiff's allegations are highly conclusory, plaintiff has alleged those facts which she must prove to establish a prima facie case of unlawful discrimination in the *de novo* decision: she is a member of a pro-

tected minority; she applied and was qualified for a tenured position that was open at the University; and despite her qualifications, she was rejected. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[2] While defendant is entitled to show, in rebuttal, that it had a legitimate reason for denying plaintiff tenure—e.g., that her qualifications were inadequate—dismissal or summary judgment in this case cannot be predicated simply on this assertion. In light of the allegations in plaintiff's complaint and supporting affidavits—as well as the leniency that is required when a *pro se* Title VII plaintiff appears before the Court—I conclude that plaintiff has raised a genuine issue of material fact and this dispute must be resolved by a trial.

In closing, I will offer some guidance to plaintiff as to how the trial will proceed. "[P]laintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). I have already articulated the proof that *McDonnell Douglas* indicates will establish a prima facie case. *See* note 2 *supra* and accompanying text. I should add that the elements of a prima facie case are "not inflexible, as '[t]he facts necessarily will vary in Title VII cases.'" *Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6.[3] While the burden of establishing a prima facie case "is not onerous," *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094, I must emphasize that to avoid the time-bar in section 706(e), plain-

tiff's prima facie case must be tailored to the actionable period—that is, she must provide prima facie proof showing that an unlawful discriminatory employment practice occurred within the actionable period.

■ If plaintiff establishes this prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). Even at this stage, the burden of persuasion has remained on the plaintiff, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; the burden that has shifted to the defendant is to produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094 (citation and footnote omitted).

■ If defendant satisfies this burden of production, plaintiff then has "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely

---

**2.** The *McDonnell Douglas* formulation also requires plaintiff to prove that after her rejection, "the position remained open and the employer continued to seek applications from persons of complainant's qualifications." *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). There does not appear to be any dispute here that a tenured position was available; plaintiff was considered for such a position and defendant has not suggested that plaintiff was rejected because it decided that the position was unavailable.

**3.** It should also be noted that the sequence and proofs explained here were designed for a Title VII case alleging disparate *treatment.* It also

appears that plaintiff may be attempting to establish a disparate *impact* case here—i.e., that a facially neutral employment policy has a discriminatory impact on a protected class. If plaintiff pursues that theory at trial, she should be aware "that the factual issues, and therefore the character of the evidence presented, differ" from those outlined in this discussion. *Burdine,* 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1324–30 (1983).

motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. While a showing that plaintiff was in fact more qualified than male or non-minority candidates granted tenure would certainly help plaintiff satisfy her burden of persuasion, it should be noted that this would not *necessarily* be sufficient—i.e., it *might* still be concluded that plaintiff had not established a discriminatory motive by the preponderance of the evidence. Hence, it may be useful and necessary for plaintiff to prove her additional claims—such as the claim that the decisionmakers in fact considered sex-based innuendos—in order to carry her ultimate burden. This explanation is offered to assist plaintiff as a *pro se* claimant; plaintiff is, of course, entitled to choose her own strategy in attempting to sustain her burden.

### III. CONCLUSION

Plaintiff's allegations and supporting affidavits indicate that there is a genuine issue of fact as to whether a discriminatory employment practice occurred within the actionable period. Accordingly, defendant's motion for dismissal or summary judgment is hereby DENIED.

IT IS SO ORDERED.