**Clyde Ahmad WINTERS, Plaintiff,**

v.

**IOWA STATE UNIVERSITY, Defendant.**

**No. 90 C 3166.**

United States District Court,
N.D. Illinois, E.D.

July 1, 1991.

Clyde Ahmad Winters, pro se.

John M. Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Clyde Ahmad Winters ("Winters") has filed and pursued, on his own, a race discrimination action[1] against his former employer Iowa State University ("University"), charging it with having retaliated against him for bringing an earlier Equal Employment Opportunity Commission ("EEOC") charge against University back in the late 1970s. Each side has now brought a motion for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, University's motion is granted, Winters' is denied and this action is dismissed.

### Summary Judgment Procedure

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not re-

1. Winters is black.

2. As a means of identification, all submissions in connection with Winters' motion will begin with "W–" and then continue with the appropriate description. Thus references to the supporting and opposing memoranda on Winters' mo-

quired to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, that principle thus demands a dual perspective—one this Court has sometimes described as Janus-like—that sometimes causes the denial of both motions. Fortunately that has not occurred here.

In this instance Winters, a nonlawyer, has obviously done his best to comply with the requirements of Rule 56 and this District Court's General Rule ("GR") 12(m) and 12(n) implementing Rule 56. University's responses submitted through its counsel, Iowa Assistant Attorney General John Parmeter, have sought to do the same.

Even though some portions of the parties' submissions might be viewed as falling short of the admissible-in-evidence requirement of Rule 56(e), there is really no dispute about what have proved to be the material facts under the circumstances here—that is, the uncontroverted portions of the parties' cross-submissions have proved sufficient to dispose of the motions and hence the case itself. For purposes of identification and reference throughout this opinion, here is what has been tendered in support of and in opposition to the motions:[2]

1. Winters' Motion for Summary Judgment (cited "W–P. Mo.—");

2. Winters' Statement of Material Facts (cited "W–P. 12(m)—");

3. Winters' Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment;

4. University's Resistance to Motion for Summary Judgment;

5. University's Response to Plaintiff's Statement of Material Facts (cited "W–D. 12(n)—");

tion will take the form "W–P. Mem.—" and "W–D. Mem.—," respectively. Submissions in connection with University's motion will follow the same format, beginning instead with "U–" rather than "W–."

6. Winters' Reply to Defendant's Response to Plaintiff's Statement of Material Facts;[3]

7. University's Motion To Continue Hearing on Plaintiff's Motion for Summary Judgment;

8. Winters' Response to Defendant's Motion To Continue Hearing on Plaintiff's Motion for Summary Judgment;

9. University's Motion for Summary Judgment;

10. University's Statement of Undisputed Material Facts (cited "U-D. 12(m)—");

11. University's Brief in Support of Motion for Summary Judgment;

12. Winters' Response to Defendant's Statement of Undisputed Material Facts (cited "U-P. 12(n)—"); and

13. Winters' Response to Defendant's Resistance to Motion For Summary Judgment and Resistance to Defendant's Motion For Summary Judgment.[4]

### Facts

Winters' claim has its roots over 16 years ago, when his nine months of employment as Director of University's Black Cultural Center came to an end. University's termination of his employment led to Winters' filing of an EEOC charge, and that in turn resulted in an April 1978 Settlement Agreement (the "Settlement Agreement") under which (1) Winters agreed not to bring suit on his claim, (2) EEOC agreed not to process the charge further and (3) University, without admitting any violation of Title VII, agreed "to limit employment references on [Winters] to his dates of employment and positions held while employed by [University]" (W-P. Mo. Ex. 1). University's

Affirmative Action Officer Charles Samuels ("Samuels") therefore sent interoffice communications to Professor and former Vice President for Student Affairs Dr. Wilbur Layton (id. Ex. 2) and Personnel Office Director Frank Brown (id. Ex. 3), recommending that University's responses to any future requests for references should read this way:

> The information in Mr. Clyde Winters' employment records discloses only that he was employed as Director of the Black Cultural Center at Iowa State University from August 27, 1974 to May 31, 1975. We regret that we are unable to provide any further information on his behalf.

Some eight years passed, and Winters applied to the Chicago Police Department ("CPD") for employment as a police officer. Winters of course listed University among his former employers. When the CPD sent its inquiry to University, George Jackson ("Jackson") of its Minority Student Affairs Department (who had not been one of the addressees of the Samuels memoranda) wrote back on March 10, 1986 to Lt. Arthur Wirkus, Commanding Officer of CPD's Personnel Investigations Division (id. Ex. 7):

> Dear Lt. Wirkus:
> Please excuse the delay in replying to your inquiry concerning Clyde A. Winters.
> We have searched our personnel records and have no materials on Mr. Winters. If we can be of further assistance in the future, please contact us.

As part of the CPD's regular procedure in screening applicants, it required a psychological evaluation—in this instance con-

---

**3.** This is not a filing contemplated by GR 12. As both the nature and the text of GR 12(m) and 12(n) make clear, the statements called for there are intended to smoke out the presence, or to demonstrate the absence, of any material factual issues. That procedure obviously facilitates a court's ability to deal with a summary judgment motion. But if the litigants' opposing presentations turn out to have created a genuine issue of material fact, that issue cannot be *eliminated* by anything that the movant might provide by way of supplemental factual materials. As for any *legal* insufficiency of the factual presentation by

the party opposing summary judgment, that can be dealt with in the movant's reply memorandum. Nonetheless, given the fact that Winters is a nonlawyer, this Court has taken account of the primarily argumentative presentation in this uncalled-for document. It does not affect the result.

**4.** Despite its label, this brief document really addresses University's summary judgment motion, rather than providing anything further in substantive support of Winters' motion.

ducted by Doctor of Psychology James Janik of Isaac Ray Center, Inc. Dr. Janik found that the results of the standard testing of Winters were troublesome, though not necessarily determinative of an adverse recommendation on Dr. Janik's phase of the employment decision. When on December 29, 1986 Dr. Janik telephoned Winters to follow up on the circumstances that had led to his termination by his most recent employer (Family Focus) and to ask him about the apparent discrepancy regarding any prior employment at University, here is what ensued (as quoted verbatim from *id.* Ex. 8, Dr. Janik's January 13, 1987 file memorandum):

I also asked him about the period of employment that he claimed at Iowa State University. I informed him that they had sent a letter indicating that they had no records of his being there. He informed me that he had worked in the student affairs department and worked under Dr. Layton, "before he was fired, he got fired right after I left." When I called George Jackson current director of Minority Students Affairs at Iowa State University he confirmed that he had no knowledge regarding Mr. Winters' employment there but further informed me that Dr. Layton had not been fired but had been promoted to the Chairman of the Psychology Department. Although Mr. Winters' had worked there between 1974 and 1975 Dr. Layton said "I remember Clyde. He was director of the Black Culture program. He worked with three other people at the time. When I asked if he was ever argumentative or oppositional Dr. Layton said "that fits with the picture here, he was conscientious, he was hired to be in charge of the Black culture center but when he got suggestions regarding the center he told them that they were on his turf and to let him do what he was hired to do." Dr. Layton went on to say "he couldn't recognize that he was working within an institutional framework. I remember most about him that he was

inflexible and resented supervision, otherwise he was okay with coworkers." Dr. Layton denied that he had observed Mr. Winters' appearing depressed and said "he was not moody but sensitive to any criticism and would withdraw and verbally strike out if someone tried to explain something to him. When asked to rate Mr. Winters Dr. Layton said "I would rate him below average, marginal. I was pleased when he moved. We couldn't fire him because of the times;" he said he would not rehire Mr. Winters. When asked about how he would feel about Mr. Winters being a policeman in his neighborhood he said, "I worry about him, it's that he carries a heavy load of hostility and that would scare me. He seems like he had a lot of unfulfilled needs and wants and I would not want him to be in charge of other people.

Based on the combination of Winters' questionable psychological testing, his personal interview and the responses from Family Focus and Dr. Layton, Dr. Janik recommended against his being hired by the CPD. As a result of that adverse recommendation, Winters (who some months earlier had been found physically qualified for probationary duty with the CPD) was notified on January 13, 1987 that he was denied employment. Despite the fact that Winters already *knew* that a letter of the type described to him by Dr. Janik—a statement by a University representative that Winters' employment there could not be verified—would be a violation of the Settlement Agreement (Winters Aff. ¶¶ 3, 9, 25 [5]), he did not file an EEOC charge against University for claimed retaliation until August 15, 1988—more than 18 months later (U–D. 12(m) Ex. I).

Winters' explanation of his mindset at the time of Dr. Janik's notification is this (*id.* ¶¶ 21–25):

21. On December 29, 1986 Dr. Janik called me at my home and claimed that he had a letter claiming I had not worked at ISU.

5. As part of Winters' submission in support of his summary judgment motion, Winters has attached his own affidavit (cited, as here, "Winters Aff. ¶—") and refers to it throughout his W–P. 12(m) statement.

22. This shocked me greatly and caused me to become upset.

23. I told Dr. Janik, that he was a lier. Because Det. Duignan of the CPD had told me in May 1986 that I had passed the background check.

24. I also believed Dr. Janik was lying because on 22 December 1986 at the oral evaluation he never mentioned to me that ISU had failed to acknowledge my former employment or showed me the purported letter of George Jackson.

25. I also knew Dr. Janik, was lier, because I knew I had an agreement with defendant that assured me that defendant would not deny my former employment.

Winters seeks to treat the timeliness of his EEOC charge as a function of his much later actual receipt of a copy of Jackson's letter—something that occurred on May 25, 1988. That came as the result of Winters' filing of a discrimination claim against the CPD before the Illinois Human Rights Commission, whose Administrative Law Judge Alfred Burton issued a May 11, 1988 order for the production of documents by the CPD (U–P. 12(n) Ex. 1).

In terms of the timing requirements under Title VII, if Winters manages to satisfy the requirement as to the administrative filing of his charge, he faces no other problems. Winters received EEOC's "right to sue" letter on March 9, 1990, and this action was filed less than 90 days after that—on June 4, 1990.

Those are the relevant facts on University's motion for summary judgment. As for Winters' motion, some aspects of University's false response to Dr. Janik call for further elaboration:

1. There is no question that pursuant to University's record retention requirements (W–P. Mo.Ex. 5), Winters' personnel card was still in University's personnel file at the time of the CPD inquiry. And that card (*id.* Ex. 4) did contain this handwritten notation consistent with the Settlement Agreement:

Release only title and dates of employment.

Refer any inquiry to Mr. Brown or Mr. Abbey.

2. Jackson gave this explanation in his July 17, 1989 affidavit furnished to EEOC in connection with its investigation of Winters' 1988 charge (the one now at issue) (W–D. 12(n) Ex. G):

I began my employment with the Iowa State University (ISU) in September 1978. I am assistant Vice President for Student Affairs and Assistant Dean of the Graduate College. I am a Black American.

The Chicago Police Department inquired regarding verification of employment of Clyde A. Winters. On March 10, 1986 I replied to the Chicago Police Department that "We have searched our personnel records and have no materials on Mr. Winters." I had searched only those personnel records in the Office of Minority Student Affairs. Since I didn't know Mr. Winters and wasn't a party to any agreements between ISU and the Equal Employment Opportunity Commission, I would have no reason to retaliate against him because he opposed practices he perceived to be unlawful under Title VII. To the best of my knowledge, I have never met, spoken to or seen Mr. Winters. I do not recall receiving any other inquiries from prospective employers regarding employment verification for Mr. Winters.

Nothing in the record either directly or inferentially casts any doubt on that statement.

3. After Dr. Janik told Winters about the University's (that is, Jackson's) letter stating that it had no record of his having worked there, Winters said he had worked in the Student Affairs Department under Dr. Layton, who Winters said had himself been "fired right after I left" (W–P. Mo. Ex. 8). Dr. Janik then called Jackson, who confirmed that he had no knowledge of Winters' employment and said that Dr. Layton (rather than having been fired) had been promoted to become Chairman of the Psychology Department. Dr. Janik then called Dr. Layton, who confirmed Winters' pri-

or employment but who—in the language already quoted—responded to Dr. Janik's inquiries with some adverse as well as some favorable comments about Winters (*id.*).

4. According to Dr. Janik's October 1, 1989 affidavit, provided to EEOC in connection with Winters' current charge against University (W–D. 12(n) Ex. D):

(a) It was because Winters had scored outside of the acceptable norms on the Minnesota Multiphasic Inventory ("MMPI") test that Dr. Janik scheduled the personal interview with him.

(b) As part of Dr. Janik's evaluation he next turned to inquiries directed to Winters' former employers. Negative information from Family Focus, the most recent employer, led Dr. Janik to check back with University (to see whether the negative feedback was the result of some personal animosity, rather than something contraindicative of hiring by the CPD).

(c) Dr. Janik therefore had a telephone conversation with Dr. Layton, whose "information was negative regarding Mr. Winters' personality and character."

(d) Dr. Janik's recommendation that Winters should not be hired by the CPD was "[b]ased upon test MMPI scores, his response to the interview and statements from previous employers." Dr. Janik elaborated on those reasons:

The next process in my evaluation of Mr. Winters was to interview previous employers. Mr. Winters [was employed by] Family Focus from May 1982 to October 1982. I talked to a Ms. Delores Holmes on 12/22/86 at Family Focus and have supplied EEOC a copy of my memo concerning this conversation. Because of negative information I received from Ms. Holmes I wanted to check with previous supervisors on Mr. Winters' employment, given that there might have been personal animosity between Mr. Winters & Ms. Holmes. Next I talked with Dr. Layton of Iowa State University. His information was negative regarding Mr. Winters personality and character. I have provided EEOC with a copy of my memo of this conversation.

(e) Perhaps most significant for the causal aspect of Winters' current claim, Dr. Janik said this:

Based upon test MMPI scores, his response to the interview, and statements from previous supervisors, I recommended that he not be hired by the Chicago Police Dept. as a police officer.[6]

One of the scores that concerned me on the MMPI was that he scored in the 98% for depression. 100% would be the most depressed score possible. That in itself was not reason enough that Mr. Winters not be accepted, or any other single aspect of my evaluation of him.

*University's Summary Judgment Motion*

Winters' claim is advanced under the anti-retaliatory provision of Title VII, 42 U.S.C. § 2000e–3(a) (as to the prima facie requirements of such a claim, see *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1313–14 (7th Cir.1989) and cases cited there). It rests on the contention that University's 1986 breach of the Settlement Agreement was assertedly motivated by its intention to retaliate against Winters for his original 1976 charge of discrimination on University's part. This opinion will assume for the moment that Winters could prove that—or, in terms of the lesser standard that would suffice to

---

**6.** [Footnote by this Court] Here is the January 7, 1987 letter from Dr. Janik to Captain Joseph Beazley, Director of the CPD Personnel Department (W–D. 12(n) Ex. C, a form letter with the underscoring indicating the language that filled in the blanks):

After consideration of <u>Clyde Winters'</u> Inwald Personality Inventory (IPI) and Minnesota Multiphasic Inventory (MMPI) test results, after conducting a personal interview with <u>Clyde Winters</u> on <u>Dec. 22, 1986</u> and after reviewing pertinent background information concerning <u>him,</u> I recommend that <u>Clyde Winters, SS# 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,</u> not be accepted as a recruit candidate for a position as a police officer with the Chicago Police Department.

defeat University's summary judgment effort, that Winters could create a material factual dispute on that score. Hence the focus here will be on whether Winters' EEOC charge of such retaliation was submitted too late.

■ In a state such as Illinois, having a state agency designated for the consideration of discrimination claims, a claimant has 300 days after the discriminatory act within which to bring his or her charge before EEOC. Failure to do so is fatal—characterized as jurisdictional where no charge is filed at all (*Bullard v. Sercon Corp.*, 846 F.2d 463, 467–68 (7th Cir.1988)), although the potential for equitable tolling serves to temper that label where equitable grounds for *delay* in filing exist and a belated filing is made (*id.* at 468).

■ It is undisputed here that in December 1986 Dr. Janik *told* Winters that University had disavowed any knowledge of his prior employment—here is what Winters' own W-P. 12(m) acknowledges:

11. On 29 December 1986, Dr. J. Janik, as part of his oral psychological examination called Mr. George Jackson and asked him to verify the contents of his letter of 10 March 1986. Again Mr. Jackson claimed defendant did not have any record of plaintiff's employment. (see exhibit 8, attached to motion for summary judgment)

12. On December 29, 1986 plaintiff was first informed that Iowa State had claimed plaintiff had never worked at ISU. (see affidavit para. 21–22)

13. Plaintiff called Dr. Janik a liar during telephone conversation on 29 December 1986 because he had already passed the background check of the Chicago Police Department, and no one had told him about this alleged letter before 29 December 1986. (see affidavit para. 24–25)

That alone did not of course ripen Winters' claim against University—it takes a consequent injury to Winters to do that (*Delaware State College v. Ricks*, 449 U.S. 250, 256–58, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980)). Most recently in this Circuit *Webb v. Indiana National Bank*, 931 F.2d 434, 435–37 (7th Cir.1991) has elaborated on the legal standard in that respect, explaining it in the context of the "continuing wrong" concept in employment discrimination cases. In this instance the injury to Winters was quick in coming: On January 13, 1987 the CPD notified him that he had not been hired.

At that point Winters knew that he had passed the CPD's background check (something that he had been told back in May 1986), he knew that the reason assigned for the non-hiring was "[a]s a result of your psychological testing and evaluation" (W–D. 12(n) Ex. B), and he knew what the person conducting that testing and evaluation—Dr. Janik—had told him about University's disclaimer (the allegedly retaliatory conduct). Yet he did not file his EEOC charge against University until more than 18 months later, far more than the 300 days allowed by law. All that he offers in response is the lame excuse that he believed Dr. Janik was lying about having received a letter from University (Winters Aff. ¶¶ 23–25).[7] But if Dr. Janik were telling the truth—and Winters suggests no reason at all for his doubting that—it was enough to start the Title VII time clock ticking on his retaliation claim when he was

---

7. This Court need not credit that assertion as a justification for Winters' inaction. It appears to display a kind of paranoid reaction to everything adverse that is said about him or is done to him (see, e.g., Winters' explanation for his Family Focus termination, as well as the fact that his reaction to the CPD's refusal to hire him was to file a discrimination charge against *it* ), a pattern that to the objective observer has to suggest some doubt as to Winters' current claim against University—and perhaps even as to his original claim of discrimination that eventuated in the Settlement Agreement. That kind of doubt, however, calls for a credibility determination, which except in extraordinary circumstances is not a permissible basis for (or adjunct to) a summary judgment decision (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986)). But what this Court *can* take into account is that Winters had no right to play ostrich—to ignore the fact that it was specifically reported to him, by someone with no motive for fabrication, that University had violated its obligations under its Settlement Agreement.

turned down for the CPD job (*Webb*, 931 F.2d at 436).[8]

In sum, then, if Winters' current claim has any force (a question that need not be decided for this purpose), he knew enough to assert it by January 1987—when (1) he had been told of facts evidencing University's breach of the Settlement Agreement and (2) immediately thereafter the CPD rejected his application for employment. Because his EEOC charge against University was filed long after the expiration of the 300–day period following the January 1987 date, this action is barred by limitations. University's motion for summary judgment must be and is granted.

### *Winters' Summary Judgment Motion*

■ Even though University's success on its own motion is fully dispositive of the case, this opinion goes on to discuss Winters' motion as well.[9] On that score, his Motion ¶ 2 accurately portrays the questions on which Winters must prevail when it says:

There are two material issues in this case:

a) Plaintiff alleges defendant retaliated against plaintiff after he filed a Civil Rights Charge with the EEOC, when defendant claimed in a letter to a prospective employer that plaintiff had never been employed by defendant.

b) Plaintiff also alleges that he was denied employment and wages as a Chicago Police officer because of the retaliation of the defendant.

On the first of those two issues, this opinion has already quoted Jackson's July 17, 1989 affidavit to EEOC (W–D. 12(n) Ex. G). Nothing in the record even hints at a reason to discredit that sworn statement. And the naked assertion of a plaintiff opposing summary judgment as to the claimed existence of material facts essential to that plaintiff's claim will not stave off dismissal of the claim on the merits (*Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510).

■ That suffices to require not only the denial of Winters' motion but—once again—the granting of University's cross-motion. Out of an abundance of caution, though, just a word will be said on the second issue: the existence of a causal relationship between the claimed (but unestablished) retaliation and Winters' turndown by the CPD.

On that score Dr. Janik has said in his June 1, 1989 affidavit to EEOC (W–D. 12(n) Ex. D):

In part, I considered Dr. Layton's comments regarding Mr. Winters in making my decision not to recommend he be hired as a police officer. If I didn't have information from Dr. Layton I would have pursued information regarding Mr. Winters from other past employers.

I can't say what I would have recommended with respect to Mr. Winters as a police officer without Dr. Layton's information.

And of course Dr. Janik would never have spoken to Dr. Layton but for Jackson's letter as to the absence of any employment record regarding Winters and but for Dr. Janik's followup discussion of that subject with Winters.

Thus the necessary causal nexus did exist between University's violation of the Settlement Agreement and Janik's obtaining of the mixed review (including some adverse information) from Dr. Layton. But Dr. Janik's own uncertainty on the hypothetical question of what he would have done absent that information means,

---

**8.** It will be remembered that Winters tries to peg the time for filing the EEOC charge on his current claim to the date on which he first saw Jackson's letter in May 1988, rather than the much earlier December 1986 date when Dr. Janik told Winters of having received such a letter. Nothing in the letter itself casts any different light on an assertion that the denial of any record of prior employment was retaliatory in nature. To put the matter a bit differently, if the letter gave Winters a basis for a claim of retaliatory action on University's part, no *lesser* basis existed for the identical claim when Winters was told about the letter 18 months earlier.

**9.** If Winters were to appeal the dismissal of this action and if a different view were taken of the limitations bar, Winters' own effort to obtain a favorable judgment as a matter of law would become relevant.

with the necessary favorable inferences drawn in University's direction,[10] that there is at least enough to require the *denial* of Winters' motion (though not necessarily the granting of University's cross-motion) on that point.

### Conclusion

Although there are to be sure some disputed factual issues that might require resolution by a factfinder, they are not "material" within the meaning of Rule 56 (that is, they are not "outcome-determinative"— see, e.g., *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983)). Both on University's motion and on Winters' cross-motion, University is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**10.** It is unnecessary to detail once again the other factors unfavorable to Winters as perceived by Dr. Janik, including not only the troublesome MMPI test results but also the unfavorable reference from Winters' most recent employer (Family Focus) and Dr. Janik's intention to go back to other former employers if nothing had been learned from University. And it must be remembered that if University had responded to Dr. Janik's original inquiry exactly as Samuels had recommended back in 1978, thus *complying* with its Settlement Agreement obligation by stating that it had no information other than the fact of Winters' prior employment, that response would have given Dr. Janik nothing positive to offset the adverse information that he already had.