964 F.2d 600
 58 Fair Empl.Prac.Cas. (BNA) 1401,
58 Empl. Prac. Dec. P 41,478
James HAMILTON, Gerald Crank, Anthony Russell, et al.,
Plaintiffs-Appellants,
v.
KOMATSU DRESSER INDUSTRIES, INCORPORATED, a Joint Venture,
and Dresser Industries, Inc., Defendants-Appellees.
 No. 91-2472.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 12, 1991.
Decided May 12, 1992.
 
 R. Wayne Harvey, Harvey & Stuckel, Peoria, Ill. (argued), for plaintiffs-appellants James Hamilton and Gerald Crank.
 R. Wayne Harvey, Floyd C. Dailey, Harvey & Stuckel, Peoria, Ill., for plaintiffs-appellants Anthony Russell and Russell Carrell.
 Roy G. Davis, Keck, Mahin & Cate, Peoria, Ill. (argued), for defendants-appellees.
 Before POSNER, RIPPLE, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Plaintiffs-appellants, present and former employees of Komatsu Dresser Company and Dresser Industries, Inc. ("Dresser"), filed suit alleging, inter alia, that Dresser violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. The district court granted summary judgment in favor of Dresser finding that the plaintiffs failed to timely file discrimination charges with the Equal Employment Opportunity Commission, and the plaintiffs appeal. We affirm.
 
 I.
 
 2
 Dresser manufactures off-road trucks for the international mining and construction industries at a plant in Peoria, Illinois. In 1985, Dresser and the union representing its employees entered mid-term contract negotiations. The resulting, modified collective bargaining agreement reduced the number of positions at Dresser's Peoria plant, combining 170 single-skill positions into 28 multiple-skill positions.
 
 
 3
 To accomplish this change, Dresser and the union agreed to a program of "cross-training" under which each employee would be given an opportunity to train for the new multiple-skill positions. On November 1, 1985, all employees were classified as "second class" or "2-C" employees. As they successfully completed the training, employees would be reclassified as "first class" or "1-C" employees. First class employees were employees with the multiple skills necessary to perform one of the 28 new multiple-skill positions.
 
 
 4
 Dresser also agreed that no less than 15% of the bargaining unit jobs would be reserved for second class employees. This was in recognition of the fact that there were bound to be employees who, for whatever reason, would not be able to become first class employees. Second class employees were subject to a greater risk of lay-off than first class employees. If the number of second class employees exceeded the number of second class jobs, the second class employees would be laid off according to seniority.
 
 
 5
 Plaintiffs-appellants worked in Dresser's Electrical Assembly Department making the various electrical subassembly components that were eventually transferred to the Assembly Department for installation and testing in the trucks. The modified collective bargaining agreement combined the subassembly and installation jobs into one position known as the 1-C Electrical Assembler position. The 1-C Electrical Assembler position was more physically demanding than the electrical subassembly position held by each of the plaintiffs. The plaintiffs were subject to medical restrictions limiting their ability to do strenuous work. Thus, in January 1986, to determine whether the plaintiffs should be permitted to train for the 1-C Electrical Assembler position, they were examined by Dresser's company doctor. The company doctor concluded that the plaintiffs were physically unable to undergo the training necessary for the 1-C positions. In February 1986, Dresser notified the plaintiffs that they would not be permitted to train for the new 1-C positions.
 
 
 6
 On February 7, 1986, the union filed a general grievance on behalf of all employees denied training for 1-C positions. The union claimed that Dresser violated the modified collective bargaining agreement by disqualifying the plaintiffs (and others) from cross-training due to medical reasons. The grievances went to arbitration on January 16, 1987, and on June 5, 1987, the arbitrator found in favor of Dresser.
 
 
 7
 On February 26, 1986, soon after this grievance was initiated, Dresser allowed the plaintiffs to enroll in the 1-C training program. The plaintiffs participated in various sessions of the 1-C training program from February through November 1986. On December 8, 1986, Dresser promoted all the 2-C Electrical Assemblers to 1-C Electrical Assemblers--except for the five oldest Electrical Assemblers, including the plaintiffs, and one other employee. Plaintiffs Hamilton, Crank and Russell were laid off on or about February 19, 1987. Plaintiff Carrell continued to work but, in March 1988, was denied a promotion.
 
 
 8
 The plaintiffs then filed charges of age and handicap discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC"). Hamilton filed on February 19, 1987, the day he was laid off; Russell filed on February 26, 1987, seven days after he was laid off; Crank filed on August 2, 1987, 164 days after he was laid off; and Carrell filed on August 2, 1988, about 150 days after he was denied a promotion. The EEOC dismissed the charges as untimely filed and issued a right to sue letter. On February 15, 1989, the plaintiffs filed a multi-count complaint in the district court alleging that Dresser violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), the Rehabilitation Act, 29 U.S.C. § 701 et seq., the Illinois Human Rights Act, Ill.Rev.Stat., ch. 68, para. 1-101 et seq., and the Illinois Constitution by refusing to train them for the 1-C positions and then laying them off on the basis of age and physical handicap.
 
 
 9
 The district court granted summary judgment for Dresser on all counts of the complaint. The plaintiffs, however, appeal only the district court's decision on the ADEA counts. The district court found that Dresser was entitled to summary judgment on these counts because the plaintiffs had failed to timely file charges with the EEOC. Timely filing a charge of age discrimination with the EEOC is a prerequisite to maintaining an action under the ADEA. 29 U.S.C. § 626(d). In a deferral state such as Illinois, an ADEA plaintiff must file an EEOC charge "within 300 days after the alleged unlawful practice occurred...." 29 U.S.C. § 626(d)(2). The district court found that the unlawful employment practice occurred when Dresser refused to allow the plaintiffs to fully train for the 1-C positions in February 1986. Accordingly, the plaintiffs were required to file charges with the EEOC by December 1986, and their filings in 1987 and 1988 were too late. The district court also found that, although Dresser allowed the plaintiffs to participate in the 1-C training, equitable estoppel principles did not apply to toll the filing period. The plaintiffs dispute both findings.[1]
 
 
 10
 We review the district court's grant of summary judgment de novo, applying the same standard as that employed by the district court. Stark v. Dynascan Corp., 902 F.2d 549, 551 (7th Cir.1990). We will affirm the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c).
 
 II.
 
 11
 In Illinois, an employee may bring an age discrimination suit under the ADEA only if he filed a charge with the EEOC "within 300 days after the alleged unlawful practice occurred...." 29 U.S.C. § 626(d)(2); Stark, 902 F.2d at 551. Determining when this filing period begins to run "requires us to identify precisely the 'unlawful employment practice' " of which the plaintiffs complain. Delaware State College v. Ricks, 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980). The limitations period begins to run at "the time of the discriminatory acts," not when "the consequences of the acts became most painful." Id. at 258, 101 S.Ct. at 504. See also Davidson v. Indiana-American Water Works, 953 F.2d 1058, 1059 (7th Cir.1992) ("This limitations period begins to run on the date that the defendant takes some adverse personnel action against the plaintiff, and not when the full consequences of the action are felt.").
 
 
 12
 The district court, applying Ricks, found that the discriminatory act was Dresser's refusal to train the plaintiffs in February 1986. Thus, the plaintiffs were required to file charges with the EEOC within 300 days of first being notified that they would not be allowed to participate in the required 1-C training, or by December 1986. Their February 1987, August 1987, and August 1988 filings were too late. The plaintiffs, however, argue that they timely filed charges with the EEOC because the discriminatory act did not occur until they were actually laid off in February 1987 (and, for Carrell, when he was not promoted in March 1988).
 
 
 13
 We agree with the district court that the layoffs and failure to promote were only consequences of the refusal to train. The plaintiffs could not be reclassified as 1-C employees because they were not allowed to complete the 1-C training. Because the plaintiffs were 2-C employees, they were more vulnerable to layoffs under the modified collective bargaining agreement. It is undisputed that, under the modified agreement, if the plaintiffs had been trained and then reclassified as 1-C employees, they would not have been laid off. The plaintiffs do not claim that the seniority system in the modified agreement was itself discriminatory; the plaintiffs were laid off and denied promotion under the facially neutral seniority system because they were 2-C employees, not because of their age. The neutral application of a non-discriminatory seniority system is not itself a discriminatory act. See Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 905, 109 S.Ct. 2261, 2265, 104 L.Ed.2d 961 (1989); United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Thus, as the district court found, the only discriminatory act alleged by the plaintiffs was Dresser's initial refusal to train them for the 1-C positions, and the 300-day filing period began to run from the time Dresser made that decision and communicated it to the plaintiffs. This is so even though the effects of that decision--the eventual layoffs and failure to promote--did not occur until later. Ricks, 449 U.S. at 258, 101 S.Ct. at 504.[2]
 
 
 14
 The plaintiffs try to avoid the effects of Ricks by arguing that there was a "continuing violation" of the ADEA that began when Dresser refused to train them and continued until they were laid off or refused promotion. " 'To succeed under a continuing violation theory, [the plaintiffs] must demonstrate that the acts of alleged discrimination are part of an ongoing pattern of discrimination and that at least one of the alleged discrete acts of discrimination occurred within the relevant limitations period.' " Davidson, 953 F.2d at 1060 (quoting Young v. Will County Dep't of Public Aid, 882 F.2d 290, 292 (7th Cir.1989)); Stewart v. CPC Intern., Inc., 679 F.2d 117, 121 (7th Cir.1982) ("At least one discriminatory act must have occurred within the charge-filing period."). This they failed to do. The plaintiffs do not allege any discrete acts of discrimination other than the refusal to train. As we have already explained, the layoffs (and failure to promote) are only consequences of Dresser's earlier refusal to retrain and not independent discriminatory acts. The plaintiffs do not allege, nor does the record reveal, any discrete acts of discrimination between the February 1986 refusal to train and the layoffs in February 1987. "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Ricks, 449 U.S. at 257, 101 S.Ct. at 504 (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)).
 
 
 15
 This case is indistinguishable from the many cases that have found allegations of a discriminatory act leading, some time later, to termination of employment insufficient to establish a continuing violation. See, e.g., Ricks, 449 U.S. at 256-58, 101 S.Ct. at 503-04 (limitations period began to run when professor informed that he was denied tenure, not when his employment was terminated one year later); Davidson v. Indiana-American Water Works, 953 F.2d 1058 (7th Cir.1992) (limitations period began to run when employee was transferred to another department, not when she was "constructively discharged" four months later); Cada v. Baxter Healthcare Corp., 920 F.2d 446 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) (limitations period began to run when employee was told he would be terminated two weeks after a replacement was hired, not when he was terminated).
 
 III.
 
 16
 The plaintiffs next contend that Dresser is equitably estopped from arguing that the EEOC charges were not timely filed. It is well settled that the limitations period of 29 U.S.C. § 626(d) is not absolute, but is subject to equitable modification. Mull v. ARCO Durethene Plastics, Inc., 784 F.2d 284, 291 (7th Cir.1986). Two distinct kinds of equitable modification apply to ADEA cases: equitable tolling and equitable estoppel. Id.; see also Cada, 920 F.2d at 451-52 (noting that some cases, including Stark v. Dynascan Corp., 902 F.2d 549 (7th Cir.1990), inadvertently fuse the two doctrines). "The equitable tolling doctrine does not require that the plaintiff show any misconduct on the part of the defendant. Instead, equitable tolling 'permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.' " Wheeldon v. Monon Corp., 946 F.2d 533, 536 (7th Cir.1991) (quoting Cada, 920 F.2d at 451). Thus, equitable tolling "focuses on the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to the defendant." Mull, 784 F.2d at 291.
 
 
 17
 Equitable estoppel, however, on which the plaintiffs rely, "focuses on the actions of the defendant." Id. "Equitable estoppel is available only when the employee's otherwise untimely filing was the result 'either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.' " Id. at 292 (citation omitted); see also Cada, 920 F.2d at 450 (defendant must take "active steps to prevent the plaintiff from suing in time"). To invoke the doctrine of equitable estoppel, the plaintiffs must show (1) improper conduct by Dresser and (2) their actual and reasonable reliance on such conduct. Wheeldon, 946 F.2d at 537; Mull, 784 F.2d at 292.
 
 
 18
 In this case, the plaintiffs have invoked the doctrine of equitable estoppel claiming that Dresser lulled them into not timely filing charges with the EEOC by allowing them to participate in 1-C training. In early February 1986, Dresser told the plaintiffs that they would not be allowed to train for the 1-C assembler position. But then, on February 26, 1986, shortly after the plaintiffs filed grievances, Dresser allowed the plaintiffs to begin at least some of the 1-C training. The plaintiffs participated in several sessions of the 1-C training through November 1986. November 1986 is within the 300-day filing period of 29 U.S.C. § 626(d)(2). Dresser claims that the plaintiffs only received partial training; they were allowed to take the classroom portion of the training but not the physical portion. Thus, Dresser argues, the plaintiffs knew that the training would not result in their promotion to 1-C and could not have delayed filing their EEOC charges in reliance on the training.
 
 
 19
 Dresser is correct that it is entitled to summary judgment if the plaintiffs only received partial training and knew such training would not lead to promotion. If these facts are true, the plaintiffs cannot show reliance and equitable estoppel does not apply. The record, however, is far from clear. The plaintiffs each filed an affidavit stating that on or about February 26, 1986, he "began receiving" the training for the 1-C position. Dresser's Director of Employee and Labor Relations, Gary Aubry, stated in his affidavit that "[e]mployees physically unable to complete the entire training program were allowed to attend training sessions which did not exceed their physical limitations." There is no other indication in the record, however, of the type or extent of the training the plaintiffs received or if they completed the training.[3] Further, the record contains no evidence on whether or not Dresser told the plaintiffs that they would be allowed to complete the full 1-C training and would be reclassified as 1-C employees.
 
 
 20
 Although we would prefer that the record had been more fully developed in the district court, the lack of facts in the record does not help the plaintiffs. We held above that the 300-day limitations period of 29 U.S.C. § 626(d)(2) began to run when Dresser refused to train the plaintiffs in February 1986. Thus, unless the doctrine of equitable estoppel applies to toll the limitations period, the plaintiffs' charges were not timely filed. In this motion for summary judgment, "the burden is on the plaintiff[s] to present facts which, if true, would justify equitable modification of the statute of limitations." Stark, 902 F.2d at 551. Since the plaintiffs have the burden of proof, they may not rest on the pleadings but must affirmatively demonstrate, by setting forth specific facts, that there is a genuine issue of material fact for trial. Fed.R.Civ.Pro. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 21
 The only relevant fact that the plaintiffs have presented is that they were allowed to begin the 1-C training. This fact alone, however, is not sufficient to justify the application of equitable estoppel. There are no facts in the record tending to show that Dresser was attempting to lull the plaintiffs into not filing EEOC charges. The company doctor examined the plaintiffs and concluded that they were physically unable to complete the 1-C training. Then, Dresser informed the plaintiffs that they would not be allowed to train. Although the plaintiffs were later allowed to participate in some type of training, there is no evidence that the doctor changed his medical opinion or that Dresser told the plaintiffs that they would be allowed to complete the full 1-C training. The fact that Dresser, in allowing the plaintiffs to begin the training, took favorable action toward the plaintiffs is not by itself evidence of improper conduct. Mull, 784 F.2d at 292 ("an employer's attempts to lessen the adverse impact of an employment decision will not as a matter of law serve to toll the limitations period"). The plaintiffs have also failed to show reliance. True, there are no admissions in the record that the plaintiffs knew they would not be allowed to complete the 1-C training. However, there are also no facts in the record tending to show that the plaintiffs did rely on Dresser's allowing them to begin the training. To the contrary, the fact that the plaintiffs continued to pursue grievances asserting that they were improperly denied the opportunity to train demonstrates that the plaintiffs did not rely on being allowed to train. If the plaintiffs believed that Dresser had changed its mind, why would they continue to pursue their grievances?
 
 
 22
 Finally, we note that the absence of facts in the record is not due to inadequate time for discovery. The type of facts which could have overcome the motion for summary judgment are within plaintiffs' control and knowledge. The plaintiffs could have described the training they received and told us whether or not they completed the full training. The plaintiffs could have described any statements or actions by Dresser which led them to believe they had been put back on track for the 1-C positions. No such facts appear in the plaintiffs' affidavits or elsewhere in the record. We can, therefore, only assume such facts do not exist.
 
 IV.
 
 23
 For the foregoing reasons, the district court's grant of summary judgment in favor of Komatsu Dresser Company and Dresser Industries, Inc. is
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 The plaintiffs also argue that Dresser has waived the timely filing issue by failing to raise the issue as an affirmative defense in its Answer and by admitting in the Answer that the plaintiffs had timely filed charges with the EEOC. Plaintiffs, however, have waived these waiver arguments by failing to raise them before the district court (where Dresser could have amended its Answer)
 
 
 [2]
 The plaintiffs cite Bonham v. Dresser Industries, Inc., 569 F.2d 187 (3rd Cir.1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), as the "leading case" for determining when the filing period of 29 U.S.C. § 626 begins to run. The court in Bonham held that the filing period "does not begin to run until the employee knows, or as a reasonable person should know, that the employer has made a final decision to terminate him, and the employee ceases to render further services to the employer." Id. at 192. This rule, of course, would help the plaintiffs tremendously because they did not "cease[ ] to render further services" to Dresser until they were laid off in February 1987. The problem for the plaintiffs is that, rather than being a "leading case," the Bonham rule--which was cited and followed by the Third Circuit in Ricks v. Delaware State College, 605 F.2d 710, 711-713 (3rd Cir.1979)--was clearly rejected when the Supreme Court reversed Ricks in 1980
 
 
 [3]
 In its Reply to Plaintiffs' Response to Motion for Summary Judgment, Dresser asserted that the plaintiffs had admitted that they were only permitted to do the classroom portion of the training, citing to pages in the plaintiffs' depositions. The cited pages of the depositions, however, are not in the record