# SUPREME COURT OF THE UNITED STATES

CHANEL E. M. NICHOLSON *v.* W.L. YORK, INC., DBA
COVER GIRLS, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–7490.  Decided June 2, 2025

The petition for a writ of certiorari is denied.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting from the denial of certiorari.

Chanel Nicholson claims that, on numerous occasions between 2013 and 2021, she was barred from entering her workplace because of her race. Nicholson filed this lawsuit in 2021, alleging intentional race discrimination in violation of 42 U. S. C. §1981. According to Nicholson's complaint, the most recent instances of race discrimination occurred within the four-year statute of limitations. But the Court of Appeals nonetheless concluded that these claims were time barred. In the panel's view, the more recent acts were merely the "continued effects" of prior instances of race-based exclusion and thus were not independently actionable.

That holding flouts this Court's clear precedents. We have long held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," regardless of whether similar instances of discrimination have occurred in the past. *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 113 (2002). Because the Fifth Circuit's contrary ruling was patently erroneous, this Court should have granted Nicholson's petition and summarily reversed the judgment. I respectfully dissent from the Court's decision to do otherwise.

# I
## A

Chanel Nicholson is an adult entertainer who performed at a pair of clubs in Houston, Texas, called Splendor and Cover Girls, during the mid-2010s. Both clubs were owned and operated by the same individuals. Each club required dancers like Nicholson to sign a "License and Access Agreement" that guaranteed the performer the right to "se[t] her own schedule of when and what hours she works" and "arrive and leave the premises at any time without penalty." App. B to Third Amended Complaint (TAC) in No. 4:21–cv–2624 (SD Tex., June 24, 2022), ECF Doc. 47–2, p. 6, ¶3; App. C to TAC, ECF Doc. 47–3, p. 7, ¶3. Nicholson signed the agreement with Splendor in 2014 and performed at the establishment through 2016. She signed the Cover Girls agreement in 2016 and performed there through 2017.

According to Nicholson, who is African American, race discrimination pervaded the environments of both clubs. Splendor and Cover Girls were "well-known" to "severely limi[t] the total number of Black Dancers on their respective premises," TAC, ECF Doc. 47, p. 10, ¶40, because "upper management did not want too many Black Dancers" present on any given night, *id.*, at 7, ¶29. One former Cover Girls manager confirmed that it was "widely known and well-accepted that black (African American) girls generally are not given positions as dancers in these" establishments. App. D to TAC, ECF Doc. 47–4, p. 1, ¶5 (Decl. of A. Skwera). This policy was apparently so well established that, when the clubs' director of operations discovered that the manager had hired African American dancers at Cover Girls, he revoked the manager's hiring privileges. *Id.*, at 2, ¶8.

As relevant here, Nicholson alleges that management-level employees at Splendor and Cover Girls would bar Black dancers from entering those establishments if too many other Black performers were already present. "[O]n

a number of occasions," she alleges, "the door girl or an acting manager would send [Nicholson] home after [she] arrived for her shift because there were already 'too many black girls' working." ECF Doc. 47, at 7, ¶28. Nicholson estimates that, of the six to seven days per week that she would try to work at each club, she was turned away on approximately three of the days due to her race. Nicholson Deposition Tr. in No. 4:21–cv–2624 (SD Tex., Dec. 5, 2022), ECF Doc. 61–1, pp. 14, 20–21. In particular, Nicholson alleges that, while working at Cover Girls in November 2017, she was once again "told by a manager that she could not perform because there were already 'too many black girls'" in the club. ECF Doc. 47, at 8, ¶34. Nicholson eventually got "tired of being treated like that" and stopped performing at Cover Girls entirely. ECF Doc. 61–1, at 13.

Nicholson took a hiatus from dancing between 2018 and 2021, during which time her License and Access Agreements remained valid. She attempted to return to performing at Splendor in August 2021. But a manager again refused her entry, telling her they were "not taking any more black girls." *Id.*, at 21; see also ECF Doc. 47, at 9, ¶37. During this conversation, Nicholson saw a White dancer enter the club, seemingly preparing to start her shift. *Ibid.*, ¶38.

B

In August 2021, Nicholson filed a lawsuit against Splendor and Cover Girls. Invoking 42 U. S. C. §1981, she claimed that the clubs had engaged in intentional race discrimination by barring her entrance and that of other women of color. Nicholson's complaint alleged that these acts had "deprive[d]" her "of the same right to make and enforce contracts as Caucasian female entertainers." ECF Doc. 47, at 16, ¶54.

As relevant to this dispute, two of Nicholson's §1981 claims survived a motion to dismiss: one against Splendor for being denied access to the club in August 2021, and one

against Cover Girls for being denied access in November 2017. Both events allegedly occurred within the four-year period before Nicholson's August 2021 filing. The District Court nevertheless granted summary judgment in favor of the clubs and against Nicholson, on the ground that her claims regarding these allegedly discriminatory acts were untimely. App. C to Pet. for Cert. 10, 14.

The Fifth Circuit affirmed. In its view, Nicholson "was first denied access to Splendor's premises as early as a week after signing her [License and Access Agreement] in September 2014," and that same discriminatory treatment had merely "continued." App. A to Pet. for Cert. 8–9. The court thus concluded that Nicholson's "claims of unlawful discrimination began to accrue in 2014," *id.*, at 9, because she "was first turned away by Splendor for a discriminatory reason in 2014 and, when she checked back in with Splendor in 2021, nothing had changed," *id.*, at 8; see also *ibid.* ("Splendor's position [had] remained the same: Nicholson was refused access to the premises because she was Black"). According to the Fifth Circuit, "her denial of access to the club . . . on account of her race" in 2021 was "merely a continued effect of the first alleged discriminatory act that took place in 2014." *Id.*, at 9; see also *id.*, at 7.

The panel reached the same conclusion with respect to Nicholson's §1981 claim against Cover Girls. "[A]s early as her first week after signing the [License and Access Agreement] with Cover Girls in November 2016, she was denied access to the club on account of her race." *Id.*, at 10. And "nothing [had] changed when she returned to Cover Girls in November 2017—she was again denied access on account of her race." *Ibid.* Thus, Nicholson's claim against Cover Girls "began to accrue when she signed the [agreement] with the club in November 2016," and this "first act of discrimination . . . merely remained ongoing when she returned in 2017." *Ibid.*

## II

The Fifth Circuit's analysis of the statute of limitations is patently erroneous under our longstanding precedents.

### A

First enacted after the Civil War, §1981 creates a federal cause of action for claims of intentional race discrimination in contracting. The statute specifically guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." §1981(a). This Court has further recognized that §1981 establishes liability for purposeful discrimination wherever race is a but-for cause of the relevant injury. See *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 391 (1982); *Comcast Corp.* v. *National Assn. of African American-Owned Media*, 589 U. S. 327, 341 (2020).

Discrimination claims concerning contract performance are subject to a four-year statute of limitations. 28 U. S. C. §1658(a); see also *Jones* v. *R. R. Donnelley & Sons Co.*, 541 U. S. 369, 383 (2004). For claims involving discrete acts of discrimination, that statute of limitations commences on the date of the alleged discriminatory act. See *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) (*per curiam*) ("[T]he proper focus" of this inquiry is "the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful"). The statute of limitations for a §1981 claim based on a "discrete discriminatory ac[t]" thus generally runs from the day that the act "'happened.'" *Morgan*, 536 U. S., at 110.

Here, Nicholson's complaint alleges two discrete instances of discriminatory treatment by the clubs' managers and employees. Nicholson claims that Splendor and Cover Girls prevented Black dancers from working at the clubs if a sufficient number of other Black dancers were already present. She alleges, in particular, that she was barred

from entering the clubs because of her race in November 2017 and August 2021, despite her contractual right to "se[t] her own schedule" and "arrive and leave the premises at any time without penalty." ECF Doc. 47–2, at 6, ¶3; ECF Doc. 47–3, at 7, ¶3. Thus, as alleged in her complaint, Nicholson suffered two adverse and discriminatory actions—race-based exclusion from the clubs on two occasions—that took place within the four-year limitations period. This constitutes a textbook example of actionable conduct under §1981. See, *e.g.*, *Morgan*, 536 U. S., at 113.

Contrast this with discrimination claims involving actions that are not themselves discriminatory, and thus do not provide independent bases for §1981 liability or restart the statute-of-limitations clock. Sometimes plaintiffs point to adverse actions that are race neutral but nonetheless reflect the "continued effects" of earlier discriminatory decisions. Consider a professor who is initially denied tenure because of his race. That denial would be race-based and actionable under §1981, and the professor's claim would accrue "at the time the tenure decision was made and communicated to" him. *Delaware State College* v. *Ricks*, 449 U. S. 250, 258 (1980). But, notably, if the university later decides (neutrally) to discharge any faculty members who had been denied tenure, the statute of limitations for the professor's race-discrimination claim would *still* run from the initial tenure decision. *Id.*, at 253, 258. That is because the race-based tenure denial was the discriminatory cause of the professor's race-neutral termination. In other words, if the professor's subsequent termination is merely "a delayed, but inevitable, consequence" of the earlier discriminatory tenure decision, the discrimination claim accrues "at the time the tenure decision was made and communicated to" the plaintiff, not at the time of his later termination. *Id.*, at 257–258; see also *Chardon*, 454 U. S., at 8 ("The fact of termination is not itself an illegal act").

The adverse actions that Nicholson identifies are different because they exhibit no such neutrality. The clubs' policy of excluding Black dancers, if proven true, is discriminatory—but so, too, is each decision to bar a dancer from the premises because of her race. Nicholson's allegations—that, due to her race, she was barred from entering Cover Girls in November 2017 and Splendor in August 2021—are claims of unlawful discrimination that are actionable on their own terms.

The fact that Nicholson allegedly suffered similar acts of race discrimination in the past has no bearing on whether those two claims can proceed. As this Court has made abundantly clear, "[t]he existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing [claims] about related discrete acts so long as the acts are independently discriminatory." *Morgan*, 536 U. S., at 113. Rather, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Ibid.*

## B

That last point bears repeating plainly, in light of the Fifth Circuit's obvious confusion: If the discrete act that is the subject of the plaintiff's discrimination complaint is itself discriminatory, and if it allegedly occurred within the statute of limitations period, then that discrimination claim is timely—full stop.

To be sure, "discrete acts that fall *within* the statutory time period do not make timely acts that fall *outside* the time period." *Id.*, at 112 (emphasis added). But it does not follow that acts falling outside of the time period can make *un*timely those that fall squarely within it.

Nor does the continuing-violations doctrine—which applies to hostile work environment claims and similar legal claims that are "based on the cumulative effect of individual

acts," *id.*, at 115—play any role in the proper analysis. Hostile work environment claims "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct" that "may not be actionable on its own." *Ibid.* Such claims are therefore based on a "series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.*, at 117. Additionally, because of the unique nature of hostile work environment claims, the statute of limitations accrues from the most recent act that contributed to the claim, enabling suit for harassment that might have started outside the limitations window. See *ibid.*[1] For discrete-act claims such as Nicholson's, however, liability "does not depend upon proof of repeated conduct extending over a period of time." *Id.*, at 120, n. 12.

The Fifth Circuit's central misstep, then, was to conclude that past acts of race discrimination that are materially identical to subsequent discriminatory acts prevent the later acts from being actionable. In the panel's view, because the clubs' racially discriminatory positions had "remained the same" from the first alleged acts of discrimination to the last—*i.e.*, because "Nicholson was [persistently] refused access to the premises because she was Black," App. A to Pet. for Cert. 8—Nicholson had four years from the initial manifestation of this club practice to file her lawsuit. Nicholson's race-based exclusion in 2017 and 2021 was certainly not surprising, given the clubs' history of discrimination. But that does not make those exclusions nondiscriminatory. All it shows is that Nicholson experienced *multiple* acts of discrimination, each occurrence of which, if alleged within the statute of limitations, states a claim under §1981.

––––––––

[1] The continuing-violations construct does the work of pulling all of the relevant conduct *within* the statute of limitations, even if it occurred outside of that timeframe. Thus, even where relevant, that doctrine does not operate to *preclude* liability for acts that fall within the statutory timeframe.

## C

Given the above principles, calculating the statute of limitations for Nicholson's claims should have been straightforward. A discrete discriminatory act "'occur[s]' on the day that it 'happened.'" *Morgan*, 536 U. S., at 110. Here, Nicholson alleges that she was barred from entering the clubs due to her race in November 2017 and August 2021.[2] The four-year statute of limitations for Nicholson's November 2017 claim against Splendor would lapse in November 2021, and the statute of limitations for her August 2021 claim against Cover Girls would expire in August 2025. Nicholson's filing—which occurred in August 2021—satisfied both of these statutory timelines.

To conclude that Nicholson's claims are time barred because there were earlier instances of discriminatory treatment, as the Fifth Circuit did, impermissibly inoculates the clubs' more recent discriminatory conduct. If sustained discriminatory motivation is all that is required to transform recent, racially discriminatory acts into the "continued effects" of earlier discriminatory conduct, then past discrimination could inexplicably prevent recovery for later, similarly unlawful conduct. Quite to the contrary, §1981's statute of limitations plainly authorizes a legal challenge

---

[2] The primary briefs that Nicholson and respondents filed in both the Fifth Circuit and this Court repeatedly characterized Nicholson's claims as alleging "discrete" acts of discrimination. See, *e.g.*, Pet. for Cert. 24 ("Petitioner is only claiming for one discrete event: denial of her access to Splendor to work, in 2021"); *id.*, at 26 ("Plaintiff's denial of access to Cover Girls in late November 2017 was simply one more discrete, discriminatory act"); Brief in Opposition 9 (adopting Nicholson's characterization); see also Brief for Appellant in No. 23–20440 (CA5), ECF Doc. 21, pp. 18–19 ("[T]his denial of access was a discrete act of discrimination commencing a new . . . statute of limitations clock"). This opinion thus eschews construing Nicholson's allegations as pattern-or-practice claims, as the reply brief filed in this Court on Nicholson's behalf now urges. Reply to Brief in Opposition 1–3.

that is brought within four years of when the discrimina-
tory acts occurred, regardless of whether the plaintiff was
previously subjected to similar unlawful conduct, too.

*          *          *

Chanel Nicholson alleges that she was prohibited from
entering her workplace on account of her race.  Nicholson
needed to file her §1981 suit within four years of those dis-
criminatory acts—which she did.  As such, §1981's statute
of limitations should have posed no barrier to Nicholson ob-
taining judicial review of her claims.  In my view, the Court
should have granted Nicholson's petition and summarily re-
versed the Fifth Circuit's patently erroneous conclusions
about the untimeliness of her claims.